**19 MAG 10645** ORIGINAL

Approved: _____
RUSHMI BHASKARAN
Assistant United States Attorney

Before:   THE HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - X
                                        :
UNITED STATES OF AMERICA                :      SEALED COMPLAINT
                                        :
   - v. -                               :      Violations of
                                        :      18 U.S.C. §§ 1341,
                                        :      1028A, 1512(c),
                                        :      1623, and 2
STUART FINKELSTEIN,                     :
                                        :
                                        :      COUNTY OF OFFENSE:
                    Defendant.          :      NEW YORK
- - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MASON POSILKIN, being duly sworn, deposes and says
that he is a Special Agent with the U.S. Attorney's Office for
the Southern District of New York, and charges as follows:

## COUNT ONE
(Mail Fraud)

        1.    From at least in or about October 2013, up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, STUART FINKELSTEIN, the
defendant, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice and attempting so to do, did place in a post
office and authorized depository for mail matter, matters and
things to be sent and delivered by the Postal Service, and did
deposit and cause to be deposited matters and things to be sent
and delivered by private and commercial interstate carriers, and
did take and receive therefrom, such matters and things, and did
cause to be delivered by mail and such carriers, according to
the directions thereon, and at the places at which they were
directed to be delivered by the person to whom they were
addressed, such matters and things, to wit, FINKELSTEIN filed or
caused to be filed fraudulent lawsuits pursuant to the Americans

with Disabilities Act (the "ADA") against various public establishments in Florida and New York on behalf of individuals who neither authorized those lawsuits nor visited those establishments, in order to obtain cash payments for himself, and caused correspondence to be mailed from an attorney in Manhattan, New York in furtherance of his fraudulent scheme.

(Title 18, United States Code, Sections 1341 and 2.)

**COUNT TWO**
(Aggravated Identity Theft)

2.    From in or about October 2013 up to and including in or about May 2019 in the Southern District of New York and elsewhere, STUART FINKELSTEIN, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, FINKELSTEIN possessed, used, and transferred the personal identification information of Victim-1 and Victim-2 in connection with the mail fraud scheme charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**COUNT THREE**
(Obstruction of Justice)

3.    From at least in or about June 2018 up to and including at least in or about July 2018 in the Southern District of New York and elsewhere, STUART FINKELSTEIN, the defendant, did corruptly obstruct, influence, and impede an official proceeding, and attempted to do so, to wit, FINKELSTEIN made materially false statements, and threatened Victim-2 to attend a hearing, in a federal civil litigation filed in the United States District Court for the Southern District of New York.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

**COUNT FOUR**
(Obstruction of Justice)

4.    From at least in or about February 2019 up to and including at least in or about May 2019 in the Southern District of New York and elsewhere, STUART FINKELSTEIN, the defendant,

did corruptly obstruct, influence, and impede an official proceeding, and attempted to do so, to wit, FINKELSTEIN offered to return a portion of a settlement payment, and made materially false statements to the attorney of a restaurant FINKELSTEIN sued, in order to cause that attorney to withdraw a motion pending in the United States District Court for the Southern District of New York.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## COUNT FIVE
(False Declarations Before A Court)

5.   On or about March 1, 2019, in the Southern District of New York and elsewhere, STUART FINKELSTEIN, the defendant, under oath and in a declaration, verification, and statement made under penalty of perjury pursuant to Title 28, United States Code, Section 1746, in a proceeding before and ancillary to a court and grand jury of the United States, knowingly did make false material declarations, and made and used other information including books, papers, documents, records, recording and other material knowing the same to contain false, material declaration, to wit, FINKELSTEIN, in a declaration he filed in the United States District Court for the Southern District of New York, stated under penalty of perjury that Victim-2 authorized a lawsuit filed under the ADA, when in truth and fact, Victim-2 had not.

(Title 18, United States Code, Sections 1623(a) and 2.)

## COUNT SIX
(False Declarations Before A Court)

6.   On or about April 18, 2019, in the Southern District of New York and elsewhere, STUART FINKELSTEIN, the defendant, under oath and in a declaration, verification, and statement made under penalty of perjury pursuant to Title 28, United States Code, Section 1746, in a proceeding before and ancillary to a court and grand jury of the United States, knowingly did make false material declarations, and made and used other information including books, papers, documents, records, recording and other material knowing the same to contain false, material declaration, to wit, FINKELSTEIN, in a declaration he filed in the United States District Court for the Southern District of New York, stated under penalty of perjury that Victim-2 authorized a lawsuit filed under the ADA, when in truth and fact, Victim-2 had not.

3

(Title 18, United States Code, Sections 1623(a) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

7.    I am a Special Agent with the U.S. Attorney's Office for the Southern District of New York.  I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, and on my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Scheme

8.    Based on my involvement in this investigation, and as described in further detail below, I know that STUART FINKELSTEIN, the defendant, is a lawyer who has filed, or has caused to be filed, over 300 lawsuits pursuant to the Americans with Disabilities Act ("ADA") on behalf of two purported plaintiffs, Victim-1 and Victim-2.  These lawsuits were filed in the United States District Courts for the Southern District of Florida and the Southern District of New York against various public establishments (the "Victim Public Establishments"). Each of these lawsuits made representations that Victim-1 and Victim-2 were represented by FINKELSTEIN or an associate. Furthermore, each of these lawsuits alleged that Victim-1 and Victim-2 attempted to visit the Victim Public Establishments, but were unable to do so because of those establishments' alleged noncompliance with the ADA.  The lawsuits sought attorney's fees and injunctive relief to address the alleged noncompliance with the ADA.

9.    The lawsuits filed by STAURT FINKELSTEIN, the defendant, however, were fraudulent.  Victim-1 and Victim-2 neither retained nor authorized FINKELSTEIN to file ADA lawsuits on their behalf.  Contrary to FINKELSTEIN's representations, Victim-1 and Victim-2 never attempted to visit the Victim Public Establishments.  Instead, FINKELSTEIN stole the identities of Victim-1 and Victim-2, made numerous false representations to the Victim Public Establishments and the courts in the Southern District of New York and the Southern District of Florida,

4

obstructed official judicial proceedings, and then settled these fake lawsuits in order to collect approximately $930,000 in attorney's fees.

10.    Furthermore, I know from my review of documents in this case that STUART FINKELSTEIN, the defendant, caused correspondence to be mailed trough private and commercial mail carriers in furtherance of this scheme.

### Background

11.    Based on my training and experience, as well as my work on this investigation, I understand the following, among other things, about civil lawsuits filed pursuant to the ADA:

a.    The ADA provides that no one shall be discriminated against based on disability in any place of "public accommodation." 42 U.S.C. § 12182(a). Discrimination includes the failure to remove "architectural barriers . . . in existing facilities . . . where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).  The ADA can be enforced through private lawsuits, which allow plaintiffs with disabilities to request injunctive relief to address discrimination caused by an architectural barrier, and to collect attorney's fees.

b.    To assert standing under the ADA, the plaintiff must: (1) allege past injury, (2) demonstrate that it is reasonable to infer that the discriminatory treatment will continue, and (3) demonstrate that it is reasonable to infer that the plaintiff intends to return to the establishment again. To allege past injury, the plaintiff must make some effort to visit the public establishment that is being sued.

12.    Based on my review of New York State court records, I know that STUART FINKELSTEIN, the defendant, was admitted to the New York State Bar on or about December 13, 1989.  In approximately 2006, in response to an investigation opened into FINKELSTEIN for attorney misconduct, FINKELSTEIN submitted an application to resign as an attorney.  On or about February 13, 2007, FINKELSTEIN's application was granted, which resulted in him being disbarred in New York pursuant to an order issued by the Supreme Court of the State of New York (the "Order").  That Order required FINKELSTEIN to "desist and refrain from (1) practicing law in any form, either as principal, agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge,

Justice, board, commission or other public authority, (3) giving
to another an opinion as to the law or its application or any
advice in relation thereto, and (4) holding himself out in any
way as an attorney and counselor-at law."  The Order did not
expressly limit its jurisdictional reach to New York.

## FINKELSTEIN's Fraudulent Lawsuits Filed in the Name of Victim-1

13.  I know from my discussions with an attorney who
had been licensed to practice law in Florida ("Attorney-1"), as
well as my review of Attorney-1's documents, that in
approximately 2012, Attorney-1 retained STUART FINKELSTEIN, the
defendant, as a consultant to serve as an expert in ADA
litigation.  In approximately 2013, FINKELSTEIN told Attorney-1
that Victim-1, a disabled wheelchair user residing in Florida,
agreed to be an ADA plaintiff by visiting certain public places
with FINKELSTEIN, investigating whether those places were
compliant with the ADA, and where appropriate, filing lawsuits
against non-compliant establishments.  Between 2013 and 2016,
FINKELSTEIN, through Attorney-1, filed approximately over 280
such lawsuits with Victim-1 as the named plaintiff (the "Victim-
1 Lawsuits") in the United States District Court for the
Southern District of Florida.  These lawsuits generated
approximately $650,000 in attorney fees, a portion of which
Attorney-1 paid FINKELSTEIN.

14.  I know from my review of Attorney-1's documents
that in approximately March 2016, STUART FINKELSTEIN, the
defendant, submitted his resignation to Attorney-1.

15.  In approximately April 2016, Victim-1 submitted a
complaint to The Florida Bar.  Based on my review of that
complaint, as well as my interviews of Victim-1, I have learned
the following, among other things:

a.  Victim-1 stated that STUART FINKELSTEIN, the
defendant, approached Victim-1 at a gas station in Florida while
Victim-1 was filling gas in Victim-1's car.  Victim-1 stated
that FINKELSTEIN told Victim-1 that FINKELSTEIN worked for an
attorney and asked Victim-1 if Victim-1 would be willing to
assist FINKELSTEIN in assessing whether certain public
establishments were accessible for wheelchair users.
FINKELSTEIN offered to provide Victim-1 the addresses of certain
public establishments, as well as gas money.  Victim-1 stated
that Victim-1 told FINKELSTEIN, in some and substance, that
Victim-1 was glad to help, and gave FINKELSTEIN Victim-1's phone
number. Victim-1, however, did not retain FINKELSTEIN or anyone

else to file lawsuits on Victim-1's behalf.  In addition, Victim-1 said that FINKELSTEIN never provided Victim-1 with any addresses to visit.

b.   Later, FINKELSTEIN called Victim-1 and asked Victim-1 to meet FINKELSTEIN at a bank in Florida.  FINKELSTEIN asked Victim-1, in some and substance, to sign a document for a place FINKELSTEIN was going to have Victim-1 visit that FINKELSTEIN represented was not accessible.  Once again, FINKELSTEIN did not provide Victim-1 with the address of any public place to visit, and Victim-1 did not authorize FINKELSTEIN to file any lawsuits on Victim-1's behalf.

c.   In approximately early 2016, FINKELSTEIN told Victim-1 that news outlets might try to ask Victim-1 some questions, and requested Victim-1 to not respond.  Soon thereafter, Victim-1 learned from the news that Victim-1 was the apparent plaintiff in several ADA lawsuits.  Victim-1, who never authorized anyone to file these lawsuits, demanded that FINKELSTEIN provide any documents that Victim-1 allegedly signed in connection with the Victim-1 lawsuits.  Based on my involvement in this investigation, I believe that FINKELSTEIN never responded to Victim-1's request, and that in March 2016, FINKELSTEIN submitted his resignation to Attorney-1.

16.   Based on my review of documents from Attorney-1 and my discussions with Attorney-1, I know that following the resignation of STUART FINKELSTEIN, the defendant, Attorney-1, provided Victim-1 with the copies of settlement agreements that were purportedly signed by Victim-1.  I know from Victim-1 that when Victim-1 reviewed these agreements, Victim-1 saw that Victim-1's signatures had been forged.

17.   I know from my review of documents from The Florida Bar that, as a result of Victim-1's complaint, The Florida Bar opened disciplinary proceedings against Attorney-1.  Attorney-1, who believed that Victim-1 had authorized all of the Victim-1 Lawsuits but acknowledged his failure to adequately supervise STUART FINKELSTEIN, the defendant, agreed to submit his resignation to The Florida Bar.

## FINKELSTEIN's False Statements to Regain Admission to the New York Bar

18.   Based on my review of records maintained by the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, in Brooklyn, New York, I have

learned that in approximately September 2014, STUART
FINKELSTEIN, the defendant, moved for reinstatement to the New
York State Bar.  In connection with that motion, FINKELSTEIN
made or caused to be made several false representations
concerning FINKELSTEIN's work history in Florida.  For example,
FINKELSTEIN's motion stated, falsely, that following his 2007
disbarment, he "neither practiced law nor held himself out as a
lawyer while disbarred."  In describing his employment history
in Florida, FINKELSTEIN made no mention of the fact that he
assisted Attorney-1 in litigating ADA claims. FINKELSTEIN also
included his 2013 tax returns as an attachment to his
application, which omitted the income that Attorney-1 paid
FINKELSTEIN or a company that FINKELSTEIN established to receive
payments from Attorney-1.

19.  Based on my review of court records, I know that
STUART FINKELSTEIN, the defendant, was reinstated to the New
York State Bar on or about March 16, 2016.

## FINKELSTEIN's Perjurious Statements and Fraudulent Lawsuits Filed in the Name of Victim-2

20.  I have searched public databases to determine
whether STUART FINKELSTEIN, the defendant, has filed any
lawsuits in the Southern and Eastern Districts of New York since
his reinstatement to the New York Bar.  Based on that review, I
have learned that, beginning in approximately August
2017, FINKELSTEIN filed approximately 30 ADA lawsuits in those
Districts on behalf of an individual ("Victim-2") residing in
the state of New York (the "Victim-2 Lawsuits"). I know from
reviewing FINKELSTEIN's bank records that FINKELSTEIN has
collected approximately $270,000 by settling the Victim-2
Lawsuits.

21.  However, I know from my discussions with Victim-2
that Victim-2 neither authorized the Victim-2 Lawsuits, nor
visited any of the Victim Public Establishments that FINKELSTEIN
had sued. In addition, Victim-2 has explained the following,
among other things, about Victim-2's prior dealings with
FINKELSTEIN:

a.  Approximately twenty years ago, FINKELSTEIN
had represented Victim-2 in connection with a personal injury
lawsuit approximately.

b.  In approximately the spring or summer of
2017, Victim-2's family member ("Family Member-1") was looking

8

for a lawyer to represent Family Member-1 in a personal injury lawsuit.  Victim-2 referred Family Member-1 to FINKELSTEIN. Until approximately February 2019, Victim-2 spoke to FINKELSTEIN occasionally about the referral, and in one instance, Victim-2 accompanied Family Member-1 to an in-person meeting with FINKELSTEIN in a hotel in Brooklyn.  At this meeting, FINKELSTEIN saw that Victim-2 was limping due to a back condition.

        c.   Because Victim-2 referred Family Member-1 to FINKELSTEIN, FINKELSTEIN gave Victim-2 a referral fee, paid in three installments between approximately January 2018 to August 2018.

        d.   In approximately August 2017, Victim-2 told FINKELSTEIN that Victim-2 had been denied disability benefits. FINKELSTEIN offered to help Victim-2 by referring Victim-2 to a disabilities benefits attorney.  To make the referral, FINKELSTEIN asked Victim-2 to provide FINKELSTEIN with Victim-2's medical records.  Victim-2 did so in approximately April 2018.

        22.   Because Victim-2 never retained STUART FINKELSTEIN, the defendant, to file the Victim-2 lawsuits, nor visited the Victim Public Establishments that FINKELSTEIN sued, FINKELSTEIN made the following materially false declarations, under penalty of perjury, in the United States District Court for the Southern District of New York:

        a.   On or about March 1, 2019, in a federal civil proceeding which FINKELSTEIN initiated with Victim-2 as the named plaintiff, FINKELSTEIN submitted a declaration, made under the penalty of perjury pursuant to Title 28, United States Code, Section 1746, stating that Victim-2 authorized that civil proceeding, when in truth and fact, Victim-2 had not.

        b.   On or about April 18, 2019, in a federal civil proceeding which FINKELSTEIN initiated with Victim-2 as the named plaintiff, FINKELSTEIN submitted a declaration, made under the penalty of perjury pursuant to Title 28, United States Code, Section 1746, stating that Victim-2 authorized that civil proceeding, when in truth and fact, Victim-2 had not.

        23.   In addition, I know from my involvement in this investigation and my review of documents that STUART FINKELSTEIN, the defendant, caused correspondence to be mailed

Case 1:21-cr-00217-PGG   Document 1   Filed 11/12/19   Page 10 of 12

through private and commercial mail carriers in furtherance of this scheme.  For example, on or about August 10, 2018, an attorney ("Attorney-2") representing a public establishment FINKELSTEIN sued in Victim-2's name mailed FINKELSTEIN settlement documents and a settlement check. Attorney-2 mailed these documents from Attorney-2's office in Manhattan, New York, to a private post office box controlled by FINKELSTEIN.

### FINKELSTEIN's Obstruction of Justice

24.   In or about January 2018, STUART FINKELSTEIN, the defendant, filed a lawsuit ("Lawsuit-1") against a restaurant ("Restaurant-1") with Victim-2 as the named plaintiff.  I have reviewed court filings from Lawsuit-1 and email correspondence between STUART FINKELSTEIN, the defendant, and the attorneys representing Restaurant-1 (the "Restaurant-1 Attorneys").[1]  Based on my review of these documents, as well as my discussions with Victim-2, I have learned the following, among other things:

a.   On or about June 26, 2018, a federal district court judge sitting in the Southern District of New York ("Judge-1") ordered FINKELSTEIN to provide the Restaurant-1 Attorneys with Victim-2's fully-executed medical power of attorney by on or about June 27, 2018.

b.   On or about June 27, 2018, FINKELSTEIN provided the Restaurant-1 Attorneys with a power of attorney document that was purportedly signed by Victim-2.  According to Victim-2, Victim-2 did not sign this document and Victim-2's signature was forged.

c.   On or about July 2, 2018, FINKELSTEIN provided the Restaurant-1 Attorneys with a revised power of attorney form, purportedly signed by Victim-2, and a medical release form signed by FINKELSTEIN pursuant to the power of attorney form.  According to Victim-2, Victim-2 did not sign this power of attorney form and never authorized FINKELSTEIN to permit his medical records to be released to the Restaurant-1 Attorneys.

d.   On or about July 2, 2018, Judge-1 ordered FINKELSTEIN and Victim-2 to attend a court conference on or about July 13, 2018 (the "July 13 Conference").

---

[1] The email correspondence was obtained pursuant to judicially-authorized warrants obtained on August 16, 2019 (the "August 16 Warrant").

e.   According to Victim-2, prior to the July 13 Conference, FINKELSTEIN called Victim-2 and threatened to divulge confidential information about Victim-2 to others unless Victim-2 appeared with FINKELSTEIN at the July 13 Conference. FINKELSTEIN also demanded that Victim-2 arrive at the court conference in a wheelchair, even though Victim-2 did not use one. To that end, FINKELSTEIN sent money to Victim-2 for Victim-2 to purchase a wheelchair.

f.   According to court documents and Victim-2, Victim-2 appeared with FINKELSTEIN at the July 13 Conference. At FINKELSTEIN's direction, and as a result of FINKELSTEIN's threat against Victim-2, Victim-2 falsely informed the court that Victim-2 signed a power of attorney document authorizing FINKELSTEIN to release Victim-2 medical records, even though Victim-2 had not signed the document and never authorized FINKELSTEIN to release Victim-2's medical records to the Restaurant-1 Attorneys.

g.   Shortly before or after the July 13 Conference, a photograph of FINKELSTEIN and Victim-2 in a wheelchair was taken outside the United States District Court for the Southern District of New York. FINKELSTEIN also gave Victim-2 cash after the conference.

25.   I know from court records and FINKELSTEIN's bank records that in approximately June 2018, FINKELSTEIN settled an ADA lawsuit ("Lawsuit-2") against a restaurant ("Restaurant-2"), filed with Victim-2 as the named plaintiff in the United States District Court for the Southern District of New York.  According to court records, on or about February 20, 2019, a lawyer ("Attorney-3") for Restaurant-2 requested the judge ("Judge-2") to reopen Lawsuit-2 to determine whether FINKELSTEIN fraudulently filed it.

26.   On or about April 3, 2019, Judge-2 scheduled a court conference for May 1, 2019 (the "May 1 Conference") and ordered FINKELSTEIN and Victim-2 to appear.  Attorney-3 informed me that, prior to the May 1 Conference, FINKELSTEIN offered to return some of the settlement funds back to Restaurant-2 if Restaurant-2 dropped its request for a hearing. In addition, FINKELSTEIN provided Attorney-3 documents purporting to show that Victim-2 authorized Lawsuit-2.

27.   I have reviewed the documents that STUART FINKELSTEIN, the defendant, provided Attorney-3.  They include (1) call records with Victim-2, (2) redacted bank statements

11

showing a $500 cash debit, and (3) a photograph of Victim-2 and
FINKELSTEIN from the July 13 Conference.  Based on my
involvement in this investigation, including my discussions with
Victim-2, I believe that these documents do not establish that
Victim-2 retained FINKELSTEIN or authorized Lawsuit-2, or any of
the Victim-2 Lawsuits.

       28.  On the basis of FINKELSTEIN's promise to return
some of the settled funds, Attorney-3 and Restaurant-2 agreed to
drop their request for a hearing.  On or about April 30, 2019,
at the request of Attorney-3, Judge-2 cancelled the scheduled
conference.

       WHEREFORE, the deponent respectfully requests that a
warrant be issued for the arrest of STUART FINKELSTEIN, the
defendant, and that he be arrested, and imprisoned or bailed, as
the case may be.


_____
MASON POSILKIN
Special Agent
U.S. Attorney's Office, Southern
      District of New York


Sworn to before me this
 12th day of November, 2019


_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK