## DAVID K. BERTAN
**ATTORNEY AT LAW**
**41 EAST 11TH STREET, 11TH FLOOR**
**NEW YORK, NEW YORK 10003**

**(718) 742-1688**
**E-MAIL: DBERTAN@YAHOO.COM**

June 12, 2023

**<u>Filed Under Seal</u>**

Hon. Paul G. Gardephe, United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:   USA v. Stuart Finkelstein
            Docket No.  21-Cr-217 (PGG)

Dear Judge Gardephe:

      This case presents an unusual situation: Mr. Finkelstein's criminal conduct yielded societal benefits.  Mr. Finkelstein admits he filed fraudulent lawsuits, but the "victims" of his conduct, the establishments he sued, were not in compliance with the Americans with Disabilities Act (ADA).  They had an obligation to the disabled community to make their establishments accessible to all.  Mr. Finkelstein admittedly went about achieving this societal goal the wrong way, but his conduct did create significant benefits to the disabled.

      Admittedly, his fraudulent litigation caused much work for members of this Court and their staff.  But, in determining a sentence, this Court should not lose sight of the benefits Mr. Finkelstein obtained for the disabled community.  Plaintiffs in ADA lawsuits are stand-ins for the entire disabled community.  That's the reason why the ADA was created: a single person could make a difference for the general disabled population.  In a way, it doesn't make a difference that the individual plaintiffs here did not know of the lawsuits; in the grand scheme of things the proper plaintiffs were the disabled community as a whole, as the community that suffered from the establishments' failure to comply with the law.  As a result of the fraudulent

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 2

conduct, the disabled can now access these establishments.  That's the societal benefit that came from Mr. Finkelstein's conduct.

For purposes of the sentencing guidelines, there is some good-faith dispute between the parties concerning the loss amount in this case. Defendant contends that the loss cannot be calculated above $1.5 million and therefore the applicable guidelines range is 41-51 months. The Government contends that loss can be calculated above $1.5 million and therefore the applicable guidelines range is 51-63 months.

The applicable guidelines range notwithstanding, Section 3553(a) requires the Court to fashion a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing. The defense respectfully urges that a term of prison confinement is not warranted in this case. Instead, under all the facts and circumstances of this case, a sentence of probation, along with home detention, would sufficient, but not greater than necessary, to achieve the goals of punishment.

As is set forth below, this request is directly in line with many cases with facts similar to those here. Moreover, combined with Mr. Finkelstein's lack of criminal history, acceptance of responsibility, public benefit of some part of the conduct (more accessibility for the disabled community, explained below) advanced age (69 by the date of any potential term of confinement), poor health, unique caretaker status for his wife, and other factors, Mr. Finkelstein respectfully urges that this case is one where such a sentence is an appropriate exercise of this Court's discretion.

Mr. Finkelstein is 68 years old.  He has no criminal history.  He is a dedicated father and husband.  He is the primary caretaker for his wife, ███████████.
███████████████████████████████████████████████████
███████████████████████████████████████████████████

While Mr. Finkelstein does not deny responsibility for his actions, his actions did help make the establishments at issue more accessible. For that, and in light of his medical conditions, his family circumstances, and his history and characteristics, he deserves a substantial variance from the advisory guidelines range.

Under the plea agreement, the loss amount is the main driver for the advisory guidelines range.  Mr. Finkelstein does not argue with the base offense level of 7 (USSG § 2B1.1), or that there be a two level increase due to use of special skill

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 3

(USSG § 3B1.3) and a two level increase due to the offense involving more than 10 victims (USSG § 2B1.1 (b)(2)(A)(i)). The Government claims the loss amount exceeds $1,500,000. It is our contention, as noted below, that the actual loss amount is less than $1,500,000. Under the Government's estimate, a 16 level increase is warranted under USSG § 2B1.1 (b)(1)(I); under our estimate, a 14 level increase is warranted under USSG § 2B1.1 (b)(1)(H). Probation, while acknowledging the Government's preferred guidelines range, nonetheless recommends a variance of 36 months. It is important to note that Probation performed its investigation prior to Mr. Finkelstein's recent car accident which took place in October 2022: that accident, as discussed below, caused Mr. Finkelstein to suffer life-altering injuries that will require multiple surgeries in the coming months.

In light of Mr. Finkelstein's lack of criminal history, his advisory guideline range, under the Government's calculation, is 51-63 months. Under the defense calculation, the range is 41-63 months. While Probation agrees with the Government's calculation, it nonetheless recommends a downward variance for a sentence of 36 months. Under all the facts and circumstances of this case, and in light of the sentencing factors in 18 USC §3553 (a), we respectfully submit that a sentence of probation, together with a term of home detention, is the appropriate punishment for Mr. Finkelstein's conduct.

**The Sentencing Guidelines**

The Court must "impose a sentence sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). As the Supreme Court has recognized, "the principle" underlying sentencing is that "'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (defendant should receive credit for good deeds "not performed to gain status or enhance his image"). Therefore, in rendering "an individualized assessment based on the facts presented," the Court must consider the seven factors identified in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007).

For that reason, a sentencing court has a very different task to perform than a jury does. Ultimately, a jury makes a binary decision: guilty or not guilty. A sentencing court, in contrast, must go further. It must consider not merely whether a particular defendant's conduct steps over a legal line, but also how that defendant

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 4

and his conduct should be judged in relation to other defendants. See 18 U.S.C. § 3553(a)(1) and (6) (listing, among other factors, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted disparities in sentencing).

One of the seven factors is, of course, the applicable Guidelines range. *Gall*, 552 U.S. at 49. The Guidelines, however, are "truly advisory." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010). The Supreme Court has made clear that a sentencing court should not even presume a sentence within the advisory Guidelines range will comply with the statutory purposes of sentencing. "[District] judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable". *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam), citing *Gall v. United States*, 552 U.S. 38, 50 (2007). To the contrary, a district court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (A District Court may not presume that a Guidelines sentence is reasonable) *ibid*.

In doing so, the sentencing court may reject the Guidelines on policy grounds. That is, "[a] District Court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that [policy] disagreement applies to a wide class of offenders or offenses." *Id.* at 191. For instance, a policy disagreement may arise, where, as here, an applicable provision was not based on empirical data of past sentences and national experience, such that it "do[es] not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). In these instances, it is well within the sentencing court's discretion to determine that the Guidelines would "yield [a] sentence 'greater than necessary' to achieve § 3553(a)'s purposes." *Id.* at 109-110. In fact, the Second Circuit has held that a district court commits procedural error when it concludes "that it could not consider a broad, policy-based challenge to the [applicable] Guidelines." *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010).

More generally, the justification for rejecting a Guidelines sentence need only be "sufficiently compelling" in light of the individualized assessment under § 3553(a). Gall, 552 U.S. at 50. A sentence outside the Guidelines range does not require the sentencing court to find "extraordinary" circumstances, because such a requirement would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at 47. "District

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 5

judges are, as a result, generally free to impose sentences outside the recommended range." *Cavera*, 550 F.3d at 189.

**18 USC § 3553 (a)(1)**

**The Nature and Circumstances of the Offense Warrant a below-Guidelines Sentence**

According to 18 USC § 3553 (a)(1), a sentencing court is obligated to consider the nature and circumstances of the offense, and the defendant's history and characteristics. Here, both factors support a below-Guidelines sentence.

**The Offense Conduct**

On November 12, 2019, the Government charged Mr. Finkelstein with multiple counts of fraud stemming from a purported scheme to file fraudulent lawsuits under Title III of the Americans with Disabilities Act. *See* 1:19-mj-10645. On March 31, 2021, the Government filed an information including the bulk of the same charges as the original complaint. 1:21-cr-00217 Dkt. No. 35. On July 12, 2022, Mr. Finkelstein pled guilty to Count One (Mail Fraud) of the Information. Specifically, Count 1 charged that Mr. Finkelstein, from 2013 to 2019

> filed or caused to be filed fraudulent lawsuits pursuant to the Americans with Disabilities Act (the "ADA") against various places of public accommodation in Florida and New York on behalf of individuals who neither authorized those lawsuits nor suffered any injuries under the ADA to confer standing to sue such places, in order to obtain cash payments for himself, and caused correspondence to be mailed from an attorney in New York, New York in furtherance of his fraudulent scheme.

In Count 8 of the original complaint, the Government alleged that Mr. Finkelstein "is a lawyer who has filed, or has caused to be filed, over 300 lawsuits pursuant to the Americans with Disabilities Act ("ADA") on behalf of two purported plaintiffs, Victim- 1 and Victim-2. These lawsuits were filed in the United States District Courts for the Southern District of Florida and the Southern District of New York against various public establishments." Mr. Finkelstein is not, nor has ever been, an attorney in Florida. What the complaint is referring to is Mr. Finkelstein's work for a now-disbarred Florida attorney (named in the complaint as "Attorney-1")

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 6

named Mark D. Cohen[1] from 2013-2016. The majority of the alleged wrongful conduct in this case was alleged to have taken place in Florida. In fact, the PSR explains that the scheme at issue here involves over 300 fraudulent ADA lawsuits: 280 of which were filed in the Southern District of Florida ("Florida Conduct") and 30 of which were filed in the Southern and Eastern Districts of New York ("New York Conduct"). PSR ¶¶ 18, 26. The Government alleged that the Florida Conduct resulted in an aggregate gain of $650,000 in attorney's fees to Mr. Cohen, an unspecified portion of which was paid to Mr. Finkelstein, while the New York Conduct resulted in an aggregate gain of about $270,000 in attorney's fees to Mr. Finkelstein alone.

**The Americans With Disabilities Act**

Title III of the Americans with Disabilities Act("ADA") provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Under Title III of the Americans with Disabilities Act, a Plaintiff is required to establish that (1) he is disabled within the meaning of the ADA; (2) that the Defendants own, lease, or operate a place of public accommodation; and (3) that the Defendants discriminated against him within the meaning of the ADA. *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008).

In *Roberts*,—and indeed throughout much of its ADA jurisprudence—the Second Circuit has emphasized the ADA's broad remedial purpose to make society more accessible and more inclusive to the disabled community. *Roberts*, 542 F.3d at 369; *see also Mary Jo C. v. New York State and Loc. Retir. Systm*, 707 F.3d at 160 (2d Cir. 2013). In the context of a Title III suit, private plaintiffs are the lynchpin; the private Attorneys General pushing forward the "ADA's remedial goals of eliminating widespread discrimination against the disabled and integrating the disabled into the mainstream of American life." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 189 (2d Cir. 2013).

The Government charged that the underlying ADA lawsuits were fraudulent because the named plaintiffs, Jose Figueroa, and Tal Hilson, did not even try to access the premises set forth in the complaints. However, the Government has never

---

[1] *See* https://www.floridabar.org/directories/find-mbr/profile/?num=347345

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 7

contended that the establishments sued were not discriminating against the disabled community. This is because in each and every suit, the owners, controllers, and/or managers of the subject facility discriminated, and continued to discriminate against the disabled community at large by denying full and equal access to, and full and equal enjoyment of, goods, services, facilities, privileges, advantages and/or accommodations at the public places of accommodation at the subject facility, in derogation of 42 U.S.C. §12101, et. seq., and by failing to remove architectural barriers pursuant to 42 U.S.C. §12182(b)(2)(a).

### The Public Benefit of Mr. Finkelstein's conduct

This case presents an unusual situation: Mr. Finkelstein's criminal conduct yielded societal benefits. Mr. Finkelstein admits he filed fraudulent lawsuits: the "victims" of his conduct, the establishments he sued, were not in compliance with the Americans with Disabilities Act (ADA). They had an obligation to the disabled community to make their establishments accessible to all. Mr. Finkelstein admittedly went about achieving this societal goal the wrong way, but his conduct did create significant benefits to the disabled.

This sort of concept is akin to the "Credits Against Loss" prevision of the guidelines. In certain cases, it is appropriate for the district court to consider a reduction of loss as "credits against loss." *U.S. v. Nawaz*, 555 Fed.Appx. 19 (2d Cir. 2014) (citing U.S.S.G.§ 2B1.1 app. 3(E)). Under the Guidelines, the "General Rule" is that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A). "Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense. The loss amount shall be reduced by certain "credits against loss." As explained, at most, the "actual pecuniary harm" in this case is $950,000. With this in mind, Mr. Finkelstein should receive a credit against loss because of the positive value received by way of the underlying ADA litigations. *See U.S. v. Fumo*, 655 F.3d 288, 312-313 (3d Cir. 2011) ("[F]or a credit to apply, the defendant must have either returned the very same money or property, or have provided services that were applied to the very same money, value, or property that was lost or taken during the fraud"); *United States v. Markert*, 732 F.3d 920, 932 (8th Cir. 2013) ("The offender who transfers something of value to the victim generally is committing a less serious offense than an offender who does not."). However, we are not asking for a re-calculation of the guidelines based on credits against loss. The guidelines range has already been stipulated to, save the dispute concerning loss amount. Rather, the relevance of credits against loss is that it helps provide the proper context of mitigating factors about the nature and circumstances of the facts.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 8

*U.S. v. Mueffelman*, 400 F.Supp.2d 368 (D. Mass. 2005) provides a good starting point. In *Mueffelman*, the court wrestled with a question very similar to the one here: how should a district court judge analyze a defendant's culpability under 3553(a) where the defendant's conduct implicated good faith efforts to achieve net positives for society and/or those involved in dealings with the defendant. *See Mueffelman*, 400 F.Supp.2d at 378-379. Mueffelman's conduct was unique because he performed "substantial work [with] real efforts to salvage a failing operation, even where his efforts were intermingled with fraudulent conduct. *See Id.* at 379. The Court explained that the benefits and public good of Muffelman's conduct were extremely relevant for sentencing. Specifically:

> "[I]t suggests that the losses generated by Mueffelman's businesses are not the complete, much less the fair, measure of his culpability. At the very minimum, clients got Mueffelman's *work* on their behalf, even if they did not get the results he promised. Like *Emmenegger*, Mueffelman surely did not intend for people to lose over $900,000.00. On the contrary, he was consistently optimistic about his chances of getting financing for his clients in time to meet his obligations. As late as July of 1997, he was still tirelessly trying to make deals and close transactions. Let me repeat: None of this excuses Mueffelman's conduct or cast doubt on the jury's verdict. [...]. But the bona fide work he put into these enterprises suggests that the amount of the loss is not an appropriate proxy for Mueffelman's culpability or a one-to-one measure of what his sentence ought to be. Consequently, I discounted the loss three levels from the Guideline sentencing range (level twenty-one to level eighteen) and sentenced the defendant to the low end of the applicable range. He had no record; he had been a productive and law-abiding member of the community for most of his sixty plus years."

*Id.* at 379. *See U.S. v. Gordon*, 71 F.Supp.2d 128 (E.D.N.Y. 1999), *aff 'd in part and rev'd in part*, 291 F.3d 181 (2d. Cir. 2002) (In calculating fraud loss for purposes of Sentencing Guidelines' fraud loss enhancement, evidence of some value, including networking, afforded to victims of mail fraud involving sale of memberships warranted reduction of 50% in total loss attributable to defendants); *see also U.S. v. Novak*, 443 F.3d 150 (2d Cir. 2006) (explaining that mail and wire fraud statutes do not apply with same force where the purported victim received the full economic benefit of its bargain even if the underlying services were performed dishonestly).

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 9

Here, Mr. Finkelstein admits he engaged in fraudulent litigation. He is sincerely regretful for his actions and will express his apologies to the Court directly at sentencing. But, in determining a sentence, this Court should not lose sight of the benefits Mr. Finkelstein obtained for the disabled community. Plaintiffs in ADA lawsuits are stand-ins for the entire disabled community. That's the reason why the ADA was created: a single person could make a difference for the general disabled population. In a way, it does not make a difference that the individual plaintiffs here did not know of the lawsuits; in the grand scheme of things the proper plaintiffs were the disabled community as a whole, as the community that suffered from the establishments' failure to comply with the law. Again, the defense is not trivializing the conduct at issue. But it is an incontrovertible fact that as a result of the fraudulent conduct, the disabled can now access these establishments.

As the record shows in the underlying ADA litigations, Mr. Finkelstein did not merely file lawsuits and then receive attorney's fees. He fully litigated these cases, pushing towards trial, seeking the optimum repairs to the violator's establishments. The dockets of each of the lawsuits evidences his efforts and the results. Those changes made to the establishments, that accessibility for the disabled, that is the societal benefit that came from Mr. Finkelstein's conduct.

**The Unindicted Co-Conspirator**

Another unique circumstance of this case is the presence of the unindicted co-conspirator. As this Court has noted, such a circumstance should be considered in mitigating the sentence of the solely charged defendant.

In Count 8 of the original complaint, the Government alleged that Mr. Finkelstein "is a lawyer who has filed, or has caused to be filed, over 300 lawsuits pursuant to the Americans with Disabilities Act ("ADA") on behalf of two purported plaintiffs, Victim-1 and Victim-2. These lawsuits were filed in the United States District Courts for the Southern District of Florida and the Southern District of New York against various public establishments." Mr. Finkelstein is not, nor has ever been, an attorney in Florida. What the complaint is referring to is Mr. Finkelstein's work for the now-disbarred Mark D. Cohen (named in the complaint as "Attorney-1"). This is important because the most of the wrongful conduct took place in Florida. The PSR explains that the scheme at issue here involved over 300 fraudulent ADA lawsuits: 280 of which were filed in the Southern District of Florida ("Florida Conduct") and 30 of which were filed in the Southern and Eastern Districts of New

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 10

York ("New York Conduct"). PSR ¶¶ 18, 26. The Government alleged that Mr. Finkelstein "caused to be filed" some unspecified number of the 300 Florida lawsuits, resulting in some unspecified monetary gain to Mr. Finkelstein.

There are two sets of cases referenced in the information: the New York cases and the Florida cases. Mr. Finkelstein is the only person charged in both series of cases. Mark Cohen never faced any criminal sanction for his actions, even though he was the attorney who filed the 280 fraudulent lawsuits in the Florida cases.

This Court has noted that the existence of an unindicted co-conspirator who played a significant role in the offense conduct is important to consider at sentencing. *See U.S. v. Avenatti*, 1:19-cr-00373-PGG, Dkt. No. 341 at 43 (S.D.N.Y 2021) (in sentencing an attorney charged with white collar fraud, explaining that the Government's decision not to charge a central figure in the conduct could lead to an unjust sentence for the solely charged defendant). In *Avenatti*, this Court explained the unfairness of sentencing a defendant in a white-collar fraud scheme where the charging document refers to another central actor who escapes criminal liability. Specifically, the Court counseled that:

> "A variance is also necessary because of Mark Geragos. As Ms. Perry pointed out and as I have pointed out previously, Mr. Geragos was someone whom the government referenced as an unindicted co-conspirator in the criminal complaint and in the original indictment. He was not ultimately charged and he suffered no consequences as a result of his conduct, and he was a central figure in the criminal conduct."

*Id.* at 43-44. The same is true here. The Government alleged that Mr. Finkelstein filed or caused to be filed over "300 lawsuits." In fact, Mr. Cohen filed over 280 of those lawsuits. Mr. Finkelstein was never a Florida lawyer, nor did he ever file a single ADA lawsuit in Florida. Like Mr. Geragos, Mr. Cohen "was not ultimately charged and he suffered no consequences as a result of his conduct, and he was a central figure in the criminal conduct." *Id.*

The similarities between the unindicted co-conspirators are striking. In *Avenatti*, Mr. Mark Geragos, an attorney, was a "central figure" in the scheme to defraud Nike out of tens of millions of dollars. *Id.* The Government's defense of their non-charging decision regarding Mr. Geragos boiled down to one of ignorance: Mr. Geragos did not ever meet with Mr. Franklin, the putative plaintiff against Nike for Nike's potential wrongful acts against him, even though Mr. Geragos purported

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 11

to represent Mr. Franklin. *Id.* The Court's response to this argument was that 1) ignorance and silence are no defense and 2) Mr. Geragos clearly benefited from the conduct regardless. *Id.* Specifically, the Court explained:

> "if [Geragos] was going to represent [Mr. Franklin], it might have been a good idea to actually meet with him. In any event, he didn't. Instead, what he did is he called a contact at Nike. And what did he say to Nike? He said […] "I think Nike might have an Adidas problem." That's how this whole scheme got started. […] And Geragos stood to benefit enormously from this scheme because Avenatti's firm and Geragos' firm were supposed to jointly perform the purported internal investigation of Nike. Moreover, Geragos, unlike Avenatti, was a highly experienced and prominent defense attorney. Yet he sat by silently at these meetings and on these calls as Avenatti made his extortionate threats."

*Id.* at 43-44.

Clearly, Mark Cohen used the "Geragos" defense in his dealings with the Florida Bar and the Southern District of New York: he claimed he did not know what Mr. Finkelstein was doing, that he never actually met with his client Tal Hilson, for whom he filed over 280 lawsuits, and therefore was not culpable.

In light of the facts, that defense fails. Mr. Cohen represented Tal Hilson for three years in over 280 federal lawsuits. Like Geragos with Nike, it was in fact Mr. Cohen who "got this whole scheme started." *Id.* Mr. Cohen filed pleadings and motions in Hilson's name in Federal Court, settled dozens and dozens of Tal Hilson cases, and made hundreds of thousands of dollars in fees from Tal Hilson cases. Mr. Cohen, an experienced civil litigator, knew exactly what he was doing. He is clearly, in light of this Court's ruling in *Avenatti, supra,* an unindicted co-conspirator who sustained no criminal sanction for his conduct.

But even if Mr. Cohen's "ignorance of Hillson" defense were accepted as true (it should not), the logic is flawed as pointed out by this Court in *Avenatti*. Not only would it have been a "good idea" for Mr. Cohen to meet with his client (like it would have been a "good idea" for Mr. Geragos to meet with his client" he represented 280 times, but Mr. Cohen also stood to "benefit enormously" from the conduct alleged. Mr. Cohen reported that his firm made $679,110.00 from lawsuits where he represented Tal Hilson. This fairness-based reasoning is why the Court in *Avenatti*

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 12

ultimately concluded that "it would not be just, it would not be justice for Mr. Avenatti to be sentenced to a nine- to eleven-year term of imprisonment when Mr. Geragos was not even charged." *Id.* at 44. Similarly, the Court should take the lack of criminal prosecution against Mr. Cohen into account when sentencing Mr. Finkelstein. Mr. Cohen was a central figure in a large majority of the conduct alleged. It would not be justice for Mr. Finkelstein to receive a substantial prison sentence while Mr. Cohen, an unindicted co-conspirator who benefited most greatly from the conduct, faces no criminal liability whatsoever. Combined with Mr. Finkelstein's lack of criminal history, his acceptance of responsibility, the public benefit for the disabled community, his advanced age, his poor health, and his unique caretaker status for his wife, Mr. Finkelstein respectfully urges that this case is one where the Court can exercise its discretion to impose a below-guidelines sentence.

**Sentencing Guidelines and Loss Amount**

As an initial matter, this Court should not afford the guidelines great weight because the guidelines are not an appropriate guide for actual sentencing practice in fraud cases. U.S.S.G. §2B1.l, the fraud guideline, is an example of a Guideline that is not based on historical sentencing practices or research. The history of §2B1.l shows the Guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrent efficacy or any other variable relevant to the purposes of sentencing. It was not even originally intended as a codification of past sentencing practices. To the contrary, it was written with the goal of increasing the severity of sentences over their historic levels. *See United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("The loss guideline … was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."

As mentioned, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Under the plea agreement, the loss amount is the main driver for the advisory guidelines range.  Mr. Finkelstein does not argue with the base offense level of 7 (USSG § 2B1.1), or that there be a two-level increase due to use of special skill (USSG § 3B1.3) and a two-level increase due to the offense involving more than 10 victims (USSG § 2B1.1 (b)(2)(A)(i)).

The Government claims the loss amount exceeds $1,500,000.  It is our contention, as noted below, that the actual loss amount is less than $1,500,000.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 13

Under the Government's estimate, a 16-level increase is warranted under USSG § 2B1.1 (b)(1)(I); under our estimate, a 14-level increase is warranted under USSG § 2B1.1 (b)(1)(H). Accordingly, the applicable Guidelines offense level is 24 (if the Government's calculation of the Guidelines applies) or 22 (if the defendant's calculation of the Guidelines applies).

### The Applicable Guidelines Range is 41-51 Months

Based upon the calculations set forth above, if the Court adopts the Government's position, then Mr. Finkelstein's stipulated Guidelines range would be 51 to 63 months' imprisonment; if the Court adopts Mr. Finkelstein's view of loss, the Guidelines range would be 41 to 51 months' imprisonment. Accordingly, because the amount of loss in this case does not reach the $1,500,000 threshold in 2B1.1 (b)(1)(I),  the correct Guidelines Range is 41 to 51 months' imprisonment.

### Gain as the Alternative Loss Calculation

As an initial matter, the Court should use the gain method of calculating loss in this case. This is because it will be difficult, if not impossible, to show that the cost of ADA architectural repairs is a loss. This is because Mr. Finkelstein's conduct was not the "sole cause" of said costs: the public establishment's discrimination via violation of the ADA was the largest factor in needing to incur any costs associated with repair. *See U.S. v. Rostoff*, 53 F.3d 398, 405 (1st Cir. 1995) (explaining that the total dollar loss that results from the offense may not be best sentencing benchmark in "situations when a misrepresentation [is] not the sole cause of the loss."). Also, while we continue to acknowledge the wrongfulness of how Mr. Finkelstein went about filing the ADA lawsuits, it must be noted that ADA repairs (i.e., compelling a restaurant or movie theater or hotel to fix their premises so disabled people can use them) are not a loss; they are a net win for society.

The Government will likely argue that the loss amount should include any legal fees that the defendant public establishments in the underlying ADA lawsuits paid to their own lawyers in the course of defending the lawsuits. We disagree. First, any attempt to show such a loss would be speculative at best. *See United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings [at sentencing] must be grounded in the evidence and not derive from mere speculation.") Further, in an ADA Title III case, the defendant does not start violating the law at the moment that a wheelchair bound potential patron attempts entry. The public establishment violates the law at all times that they are out of compliance with the ADA and are inaccessible to any disabled patron. Legal fees

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 14

paid during the course of an ADA lawsuit are not "loss" because such fees are inextricably intertwined with the underlying ADA violations themselves. In other words, had John Doe, a wheelchair bound plaintiff, attempted to patronize any of the public establishments at issue in this case and then sued, the establishment would have incurred the exact same costs and fees as those here. And such costs and fees resulted in a net benefit to society.

If John Doe were to try to enter one of the public establishments at issue that is *now* ADA compliant, he would not consider the amount of money it took to make the establishment accessible to him a "loss." Instead, that is the societal benefit resulting from the litigation. And, as noted, attempts to calculate these numbers muddies the water. What about an ADA defendant who paid for expert fees in accomplishing the repairs? Or, what about ADA defendants who paid their lawyers to find those experts? What sort of division would happen in a situation where the ADA defendant's law firm performed its own site survey, or retained its own architects and contractors to determine the appropriate scope of repair? Or where the law firm entered into a consent decree to assure that the repairs at issue became the law of the case? In the interests of fairness, such uncertainty in calculating legal costs, and what part of those legal costs can fairly be considered loss, should move the Court to utilize the gain method in determining loss.

Given the above, it is clear that measuring loss in such a situation is difficult given the positive social nature of any architectural repairs. Not to mention that any monetary value attached to these repairs and associated fees and costs would be speculative at best. *See United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings [at sentencing] must be grounded in the evidence and not derive from mere speculation."). The only hard numerical values that are ascertainable here are the attorney's fees that were generated by the ADA lawsuits to Mr Finkelstein. Accordingly, the loss in this case is best demonstrated by any legal fees that Mr. Finkelstein made from the underlying ADA litigations, as that is also a more accurate measure of his culpability.

Where loss amount cannot be reasonably estimated, the Guidelines indicate that the proper measure is gain to the defendant from the offense. U.S.S.G. § 2B1.1 cmt. n.3(B); *United States v. Edwards*, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence far below the guideline range as substantively reasonable in a fraud case where the sentencing judge stated that the guideline range calculated using intended loss "overstated the circumstances" of the defendant's case, *see also, e.g.*, *United States v. Jimenez*, 946 F.3d 8, 14 (1st Cir. 2019) ("[H]ere

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 15

the gain to the homeowners serves as a good economic proxy for loss: what the owners did not pay, the banks did not receive."); *see also United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010) (a sentencing judge's refusal to consider gain as an alternative measure in a case where a "probable" but difficult to calculate loss exists is reversible error).

Even when employing the gain method of loss, the numbers simply do not come close to 1.5 million dollars. The Government's suggestion otherwise is belied by its own filings detailing how much money Mr. Finkelstein made from the Tal Hilson cases and from the Jose Figueroa cases. The numbers only add up to approximately $950,000; over half a million dollars short of the Government's contended amount.

Here, the complaint alleged that Mr. Finkelstein was paid "a portion" of the $679,100.00 in legal fees generated from the Hilson cases. Nowhere does the Government ever allege exactly what Hilson cases Mr. Finkelstein was involved with. Moreover, There is no showing of which ADA litigations generated payments to Mr. Finkelstein. According to Mr. Mr. Cohen's tax filings, he paid Mr. Finkelstein far less than the total amount of fees of $679,110.00 from Tal Hilson cases. His taxes reveal the following:

- 2013: Mr. Finkelstein paid 35,835.20 personally.
- 2014: Mr. Finkelstein paid $51,332.00 personally & 67,715.00 to a business account.
- 2015: Mr. Finkelstein paid 41150.00 personally and $94,500.00 to a business account.

Accordingly, of the alleged $679,110.00 that Mr. Cohen generated in fees from the Florida cases, the evidence shows that he paid less than 38% of that ($254,697.00) to Mr. Finkelstein over the course of approximately three years. The defense maintains that only the amount actually paid to Mr. Finkelstein should be considered in the loss calculation. This is because that is the loss "attributable to [this defendant's] fraud." *U.S. v. Rigas*, 583 F.3d 108, 119 (2d Cir. 2009). But even if the full $679,110.110 is attributable to Mr. Finkelstein, this amount, combined with the Figueroa cases, still falls well short of $1,500,000.00.

Regarding the New York conduct, the Government alleged that from August 2017, Mr. Finkelstein filed approximately 30 ADA lawsuits on behalf of Jose

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 16

Figueroa in New York Federal Courts and collected approximately $270,000 in legal fees by settling those lawsuits. PSR ¶ 26.

Even assuming, *arguendo*, that losses of approximately $680,000.00 (Florida Conduct) and $270,000 (New York Conduct) are proven by a preponderance of the evidence, and that both losses are actually attributable to Mr. Finkelstein, the aggregated amount is approximately $950,00.00. That amount falls far short of the Government's contended amount of loss of $1,500,000.00. Thus, the Court should find, as a matter of law, that the loss-level enhancement is 14, which means that Mr. Finkelstein's correct guidelines range is 41-51 months imprisonment.

### Mr. Finkelstein's History and Characteristics

For Mr. Finkelstein, a sentence well below the advisory guidelines range would be appropriate. In looking at the factors under (a)(1), it is the second factor that is most significant. We do not downplay the seriousness of the offense: fraud perpetrated on a court is an undoubtedly serious crime. However, as even Probation noted in its justification for a variance, Mr. Finkelstein has an admirable work history, no criminal convictions, and heavy familial obligations. Moreover, Mr. Finkelstein is a conflicted man, as shown by his own family history and his actions in this case.

In considering Mr. Finkelstein's history and characteristics, his relationship with his father had a tremendous impact on his character. His father was a lawyer, his mother was a homemaker, and both parents physically and emotionally abused him. For unknown reasons, his father resented both Mr. Finkelstein and his older brother Lowell, with one incident resulting in the father almost shooting Lowell in a rage. As time went on, Mr. Finkelstein's mother developed spinal cancer, which put her in a wheelchair, addicted to pain medication. Neither parent was supportive: Mr. Finkelstein put himself through law school. By the time his parents passed away, Mr. Finkelstein had no relationship with them.

In 1991, Mr. Finkelstein met his wife, Evelyn, at a singles weekend at the Concord Hotel in the Catskills. 2 years later, they married, 5 years later Lindsey, Mr. Finkelstein's oldest arrived, followed by Benjamin and then Rose. Lindsey works as a restaurant manager, Benjamin is currently studying for the Florida Bar Examination, and Rose lives in Florida and works for a wine company. All three children have a good relationship with him, are aware of this case, and are very supportive.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 17

     Benjamin in particular is very close with his father, whom he states is loving and supportive of his children.  Benjamin ("Benny") and Mr. Finkelstein have a close father-son relationship; Mr. Finkelstein has shared some of his innermost thoughts with his son.  As Benjamin has noted, his father has a "pure" heart, and even though he did wrong, "there was 'some good'" resulting from his actions, namely, making places more accessible for the disabled.  Benjamin notes that his father is "haunted" by the impact this case has had on his family. More specifically, Benny got his love of the law from his father. His father has showed him the best and the worst of the legal field. Benny's letter to the Court in support of this sentencing memorandum quite aptly captures his thoughts and feelings, including his insight into Mr. Finkelstein and his conduct.



Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 18

███████████████████████████████

Mr. Finkelstein's care for his wife is just one example of how he has always sought to help those with physical issues. He has a lengthy history of fighting for the disabled: He practiced personal injury law from 1989-2007 and again from 2016 to 2022. Throughout his nearly 25 years of practice, Mr. Finkelstein has recovered millions of dollars for injured clients who turned to him in their time of need. Mr. Finkelstein loved his work. He was always known as a "pitbull" for his clients, ready to fiercely advocate for his clients at every step of a case.

Moreover, as shown by the attached letter from Governor Charlie Crist, as far back as 2010 Mr. Finkelstein was working *Pro Bono* with government agencies to protect the rights of the disabled. During that time, Mr. Finkelstein was a member of a statewide council monitoring enforcement of the rights of the disabled who received State-funded services. Governor Crist's letter shows how Mr. Finkelstein has, for many years, been an advocate for the disabled. In fact, Probation recognizes Mr. Finkelstein's advocacy on behalf of the disabled, noting that during his career, "the defendant was passionate about assisting those who were disabled".

## The 18 USC §3553 (a)(2) Factors

Under 18 USC 3553 (a)(2), a sentencing court must consider the following factors: the seriousness of the offense, promoting respect for the law, providing just punishment, providing deterrence, protecting the public from any future crimes of the defendant, and providing the defendant with any needed educational or vocational training, or medical care. In addition, a sentencing court must consider sentencing disparity, both in the instant case and in general. In considering Mr. Finkelstein, those factors support a non-jail sentence of probation and home incarceration.

As noted above, we do not question the seriousness of the offense. Mail fraud and filing lawsuits without proper plaintiffs is inarguably a substantial and serious offense, and merits punishment. The question before this Court, however, is the nature and extent of that punishment. As the following discussion states, the balance of factors under § 3553 (a) support a non-jail sentence.

The next factor to consider is whether the sentence promotes respect for the law. Here, a sentence of probation for a first-time offender would nonetheless

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 19

promote respect for the law.  The offense is purely financial, and no one was physically harmed by Mr. Finkelstein's actions.  Moreover, Mr. Finkelstein's age, medical condition, and familial obligations merit a strong consideration of lenity.  In addition, a sentence of probation, along with home detention, is still a substantial punishment.  Mr. Finkelstein's liberty will be severely restricted while on home detention, and even while on probation he will be subject to continued monitoring and other restrictions.  Probation and home detention are not "free rides", and the imposition of those sentences will promote respect for the law as just, fair, and properly merciful where warranted.

Further, Mr. Finkelstein will never practice law again. This is because "criminal convictions for offenses involving fraud or dishonesty have been cited as classic grounds for the 'permanent disbarment' of attorneys, though permanent disbarment is not invariably ordered in every case." *In re R.M.W.*, 486 F.Supp.2d 518, 533 (D. Md. 2007) (collecting cases). The significance and seriousness of this fact cannot be overstated. An attorney's reputation is their biggest asset, but for Mr. Finkelstein his reputation has doomed him forever. Of course, Mr. Finkelstein brought that upon himself. Nevertheless, as a matter of sentencing, Mr. Finkelstein's loss of his license to practice law is a heavy punishment in and of itself, and provides additional support for a lesser sentence.

*United States v. Lonich*, 2021 WL 1668062 (N.D. Cal. Apr. 28, 2021) is instructive. In *Lonich*, the defendant David Lonich, a disbarred attorney, was originally sentenced to 80 months' imprisonment for conspiracy to commit bank fraud and bank fraud, conspiracy to commit wire fraud and wire fraud, money laundering, false bank entries and obstruction of justice. *See Lonich*, 2021 WL 1668062 at *1. After contracting the COVID-19 virus, Lonich moved for compassionate release on the grounds that he was in advanced age (66), was in poor health, and that he was not a risk to the public because, in part, he had been disbarred from the practice of law. *Id.* at 3. The Court agreed and sentenced him to home confinement. *Id.* at 4. The Court first acknowledged that "Lonich's age and medical conditions place him at higher risk of [health] complications if infected with the [COVID-19] virus" and that "[p]eople who are 65-74 years old are 1,100 times more likely to die from [COVID-19] infection, especially "with the pandemic's rampant spread throughout the prison system." Specifically, the court explained that Lonich's request for home confinement "would afford adequate deterrence to criminal conduct." Id. Specifically:

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 20

> "Lonich [is] not a danger to the community […]. Mr. Lonich has no prior criminal record and has "kept all court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk or a danger to the community. Mr. Lonich will serve his sentence in a home in Montgomery, Alabama that has been screened and approved by U.S. Probation. Dkt. No. 464 (U.S. Probation Resp.) at 1. He will be under the care of his wife, who has no criminal record and owns no weapons. […] [T]he Court finds the 18 U.S.C. § 3553(a) factors weigh in favor of [home confinement] […]. Furthermore, modifying Mr. Lonich's sentence to home confinement does not offend the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The Court notes Mr. Lonich has been disbarred as an attorney for the role he played in these financial crimes. Importantly, modifying Mr. Lonich's sentence to supervised release with a condition of home confinement also aligns with the need to "provide the defendant with ... medical care ... in the most effective manner." 18 U.S.C. § 3553(a)(2)(D)."

*Lonich*, 2021 WL 1668062 at *3-4. *U.S. v. Schuster*, 2002 WL 31098493 (S.D.N.Y. Sep. 19, 2002) is helpful as well.  In *Schuster*, the defendant Robert Schuster, an attorney, was convicted of multiple counts of securities fraud and bribery. Judge Griesa sentenced Schuster to three years' probation, six months of which were to be served in home confinement. *Schuster*, 2002 WL 31098493 at *1. In issuing this sentence and terminating probation early, the Court explained that the "defendant suffered an enormous penalty as a result of this conviction, by being disbarred from the practice of law" and a $50,000 fine to the [SEC]." *Id.* Further, the Court explained that it "is of value both to defendant and his family and also to the community for him to obtain productive employment which utilizes his considerable talents." *Id.* The Court concluded by noting that continued imprisonment would have no real value as far as law enforcement or any other community interest is concerned. *See Id.* Accordingly a sentence of probation, along with home incarceration, is still a substantial punishment. This is especially true because this case is not of the sort that "cries out for months behind steel bars[.]" *U.S. v. Wasilewski*, 703 F.3d 373 (7th Cir. 2012) (imposing 1/3 amount of prison time as proscribed by the guidelines range where the defendant pled guilty to embezzlement and such a sentence represented just punishment and adequate deterrence).

Like in *Lonich* and *Schuster*, Mr. Finkelstein's disbarment serves as a severe and harsh penalty, the likes of which brings shame and financial distress. Moreover, a penalty of home confinement will restrict his liberties and freedoms. Society does

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 21

not gain from Mr. Finkelstein sitting in a cell. Mr. Finkelstein holds a Juris Doctorate degree and has 68 years of life experience. He is a hard-working man, and is eager to put his talents to use in his next chapter, including public service as directed by this Court. Mr. Finkelstein's intensely close familial relationships provide support here as well. For these reasons, a sentence of home confinement is appropriate.

Along these lines, the requested sentence would certainly be just punishment. Mr. Finkelstein is 68 (almost 69) years old, with serious medical issues and surgical needs. A jail sentence, with the medical care provided to inmates, would be an inordinately harsh punishment. Mr. Finkelstein would very likely not get the surgical procedures he needs, his current medical conditions, such as diabetes and hypertension, would not be as well monitored as if he were on probation, and his overall health would drastically decline. Given his age, that decline would happen more quickly. To be blunt, the Bureau of Prisons would not provide the extent of care Mr. Finkelstein now has; as a result, a jail sentence would be truly unjust. Mr. Finkelstein would not simply lose his liberty, but would also lose what remains of his health.

The concept of deterrence would also be well-served by imposing probation. In considering general deterrence, anyone considering committing similar crimes would likely be deterred, knowing that they would face at the least a probationary sentence, along with home incarceration. On a specific level, Mr. Finkelstein would also be deterred. He feels shame and regret; he let his family down by engaging in the criminal conduct here. He is remorseful, and pleaded guilty because he acknowledged his conduct was wrong. In addition, given his age and the collateral consequences of this conviction, he is unlikely to re-offend. It is well-known that older defendants present little risk of re-offending. Moreover, Mr. Finkelstein is no longer an admitted attorney, and will not again practice law. Thus, he presents very little risk of committing further crimes.

The same holds true for protecting the public from future crimes. Mr. Finkelstein will not re-offend. He is 68 years old. When he is finished with his sentence, he will be 73. At that age, the likelihood he will commit further crimes is slim. The public is safe from any further criminal activity by Mr. Finkelstein, especially given his lack of criminal history.

A sentence below Probation's Guidelines range is also necessary to avoid an unwarranted sentencing disparity with comparable cases. The Court must consider a number of factors in imposing a sentence that is "sufficient, but not greater than

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 22

necessary" to meet the goals of the Sentencing Reform Act. 18 U.S.C. §3553(a). One consideration is "the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). The Second Circuit has found that this section requires a District Court to consider nationwide sentence disparities. *United States v. Ghaliani*, 733 F.3d 29, 55 (2d Cir. 2013). Accordingly, we request that the Court consider the following sentences imposed within the Southern District of New York and other District Courts, in cases involving fraud and attorney misconduct.

In *U.S. v. Davis*, 2010 WL 1221709 (E.D.N.Y. Mar. 29, 2010), Davis, a former attorney, pleaded guilty to count 1 of an eleven-count indictment for conspiracy to defraud financial institutions. The amount of loss in the case was over $5,000,000 and the guidelines range was 63-78 months imprisonment. *Id.* at 1-2. The Court sentenced Davis to 6 months imprisonment, explaining that "Specific deterrence is achieved through incapacitation, the likely loss of defendant's law license, and the impact of this conviction on the defendant's family and employability. It is unlikely that he will engage in further criminal activity in light of his expressions of remorse, efforts at rehabilitation, and supportive family." Id. at 2. Mr. Davis was either 41 or 42 years old when he was sentenced.[2]

In *United States v. Johnson*, 16-CR-0052 (S.D. Miss. Sept. 14, 2017), the defendant, a subsequently disbarred attorney and former assistant district attorney, was charged with conspiracy and false statements. In sentencing him to a non-prison term of probation, the Court noted the exceptional circumstances surrounding the defendant's case, his cooperation, remorse, and how deterrence would be well-served with the sentence imposed. The defendant was 35 years old when sentenced.[3]

In *United States v. Evan Greebel*, 15 Cr. 637 (KAM) (E.D.N.Y. 2018). The defendant was an attorney who was convicted after trial. The Government calculated the Guidelines at 108 to 135. Because of a dispute as to the loss amount, the Defense calculations were 24 to 30 months. At the time of the crime, the defendant was highly compensated by his firm earning almost $1 million yearly. Restitution was awarded at over $10 million. The Government argued that the defendant used his legal

---

[2] *See* USAO EDNY Press Release, *Eleven Defendants Indicted in $14 Million Mortgage Fraud Scheme*, May 21, 2008, available
https://www.justice.gov/archive/usao/nye/pr/2008/2008may21.html.

[3] *See* WLBT News, *Former Hinds County Assistant DA sentenced in federal court*, available at https://www.wlbt.com/story/36315862/former-hinds-county-assistant-da-sentenced-in-federal-court/.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 23

training and skills to defraud the victims, violating his ethical duties to his clients. He was sentenced to 18 months of incarceration. The Defendant was 45 years old when sentenced.[4]

In *United States v. Harvey Newkirk*, 14 Cr. 534 (JSR) (S.D.N.Y. 2016), the defendant was an attorney, convicted of wire fraud after a jury trial. He was acquitted of conspiracy and aggravated Identity theft. He was convicted of defrauding lenders of millions of dollars (restitution was $3.1 million). His skills as an attorney were critical to the fraud and the Government claimed that his crime was marked by lies to his law firm and victims. The defense claimed that he was guilty of conscious avoidance, and he was convicted after testifying at trial. The guidelines range was above 50 months' imprisonment. Judge Rakoff imposed a sentence of 6 months. The defendant was 40 years old at sentencing.[5]

*In United States v. Martin Weisberg,* 8 Cr. 347 (NGG) (E.D.N.Y. 2013), the defendant was an attorney employed by Baker & McKenzie LLP. He was convicted of money laundering and conspiracy to commit securities fraud. In a multi-year scheme where the loss was measured in the tens of millions of dollars, he defrauded stockholders and according to the Government, lied and stole from his clients. Weisberg faced up to 97 months' imprisonment. He consistently made false statements personally and in writing. He was sentenced to 24 months' incarceration.

In *United States v. Joseph Farkas,* 18 Cr. 340 (LGS) (S.D.N.Y. 2020), the defendant pled guilty to wire fraud and conspiracy to commit securities fraud. He induced investors to invest more than $25 million based on false claims. He personally benefitted to receive approximately $350,000. Judge Lorna G. Schofield imposed a sentence of one year and one day. The defendant was 34 years old at sentencing[6].

---

[4] *See* USAO SDNY Press Release, *New York Attorney Sentenced to 18 Months' Imprisonment*, available at
https://www.justice.gov/usao-edny/pr/new-york-attorney-sentenced-18-months-imprisonment-securities-fraud-and-wire-fraud
[5] *See* USAO SDNY Press Release, *New York Attorney Sentenced To Six Months In Prison In Manhattan Federal Court For Fraud*, available at https://www.justice.gov/usao-sdny/pr/new-york-attorney-sentenced-six-months-prison-manhattan-federal-court-fraud-connection
[6] *See* USAO SDNY Press Release, *Co-Founder Of Cryptocurrency Company Who Defrauded Ico Investors Sentenced To Prison*, December 15, 2020, available at
https://www.justice.gov/usao-sdny/pr/co-founder-cryptocurrency-company-who-defrauded-ico-investors-sentenced-prison.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 24

Based on these cases, a non-jail sentence would not involve sentencing disparity. Instead, it would be directly in line with the reasoning and the result from other, similarly situated defendants.

The final relevant factor[7] concerns Mr. Finkelstein's rehabilitation. According to 18 USC § 3553 (a)(2)(D), a sentencing court must consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment *in the most effective manner*." (emphasis added).

If Mr. Finkelstein's history and characteristics were the most significant factor under 18 USC § 3553 (a) (1), then the words "medical care" and "most effective manner" are the most significant factors under (a)(2)(D). Given his college and law school degrees, Mr. Finkelstein needs no further education; in light of his age, and his forced retirement, he doesn't need any vocational training. What he needs instead of education is to have the surgical procedures required to repair the damage from his car accident. What he needs, instead of vocational training, is to help take care of his wife during her cancer treatment. Jail will not provide him with his required surgical and medical treatment in the most effective manner.

Simply put, Mr. Finkelstein's medical conditions provide a strong basis for a variance that includes probation and home incarceration, but not jail. In fact, the Sentencing Guidelines specifically provide for home incarceration as a result of medical issues: under 5H1.4, "[I]n the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

In *United States v. Jiminez*, 212 F.Supp 2d 214 (SDNY 2002), the sentencing court considered a case where the defendant was convicted of illegal reentry, had a

---

[7] Because Mr. Finkelstein is charged alone in this case, sentencing disparity within this matter is not relevant. In terms of other, similarly situated defendants, a probationary sentence for a 68 year-old man with substantial health issues, who is the main caretaker for a very sick wife, is not out of the ordinary.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 25

prior conviction for the same offense, and had numerous other criminal convictions as well.  Prior to sentencing, the defendant argued that her current medical condition, which was from a brain aneurysm that subsequently led to severe memory loss, loss of strength, poor vision, and hallucinations, constituted extraordinary physical impairment.

In response, the Government argued that a departure for medical reasons should only happen where the Bureau of Prisons could not adequately care for the defendant.  Prior to sentencing, Judge Lynch ruled that "There is, however, no basis in law for the Government's contention."  *Ld.* at 217.  Instead, under USSG § 5H1.4, where a defendant has severe medical conditions, a lesser punishment "is permissible, and indeed specifically authorized, by the Sentencing Commision."  *Ibid.*



Along with this analysis, Mr. Finkelstein's age also plays a part.  Under 5H1.1, a defendant's advanced age and physical infirmity can also be considered.  For Mr. Finkelstein, both policy statements work in conjunction.  Although Mr. Finkelstein cannot be considered "elderly" at the age of 68, he is certainly not a young man.  Moreover, as noted, he suffers from a variety of physical ailments and medical issues.  When both his age and his medical needs are considered in light of both 5H1.1 and 5H1.4, there is little question that home detention would more efficient than incarceration in getting him the treatment he requires at his age.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 26

Yet another consideration for Mr. Finkelstein concerns his role as caregiver for his infirm wife.  Under USSG § 5H1.6, while family ties and responsibilities are not ordinarily relevant in determining a sentence, where those family circumstances are deemed extraordinary, a sentencing court can consider them in determining an appropriate sentence.  In *United States v. White*, 301 F.Supp. 2d 289 (SDNY 2004), Judge Chin determined that under 5H1.6, he had the discretion to impose a below-guidelines sentence.  As he noted, when the imposition of a guidelines sentence will result in extraordinary hardship to a defendant's family, the defendant's family circumstances can be considered a mitigation factor in deciding a sentence.  There, Judge Chin considered three questions in determining whether family circumstances warrant a downward departure: does the court have the power to depart; if so should the court exercise its discretion to do so; and, if so, to what extent should the court depart?

The first question is simple: this Court undoubtedly has the power to impose a lower sentence than provided by the Guidelines[8].  Under 5H1.6, the Sentencing Commission gave sentencing courts the discretion to consider family circumstances in determining whether a below-guidelines sentence is appropriate.

Second, in resolving the question of whether this Court should depart, Ms. Finkelstein's medical issues, and Mr. Finkelstein's role in her care, are sufficiently extraordinary that they should be considered in imposing sentence.

---

[8] It is important to note at this point that *White*, *supra*, was decided the year before the Supreme Court's decision in *United States v. Booker*, 543 US 220 (2005).  At the time *White* was decided, the Guidelines were still mandatory, and thus the only way to impose a lower sentence was to formally find a basis for a departure.

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 27



Third, in considering the extent of the variance, this Court can consider that under home detention, Mr. Finkelstein is significantly restricted.  While he will not be behind bars, he will be limited to his apartment, with brief excursions for medical treatment for himself and his wife.  To the extent this Court also imposes a sentence of probation, the period of home detention can run concurrently for that term.  Mr. Finkelstein will still be punished, and will be punished to an extent that is commensurate with the nature of his offense.  In contrast, the defendant in *United States v. White, supra*, faced a sentence of 57-71 months for her role in a bank robbery.  After reviewing the questions raised above, and noting the seriousness of bank robbery, Judge Chin decided to depart downward by 8 levels, and planned to impose a sentence of between 24-30 months.   Here, given the history and circumstances of the offense, a substantial sentence of home detention would be a sufficient, but not greater than necessary, punishment.

As a final note regarding Mr. Finkelstein's family circumstances, he and his wife are dependent on his social security payments to meet expenses.  Under § 404.468 of the Code of Federal Regulations, Mr. Finkelstein will not receive any Social Security payments if he is sentenced to prison.

No monthly benefits will be paid to any individual for any month any part of which the individual is confined in a jail, prison, or other penal institution or correctional facility for conviction of a felony.

*Confinement.* In general, a jail, prison, or other penal institution or correctional facility is a facility which is under the control and jurisdiction of the agency in charge of the penal system or in which convicted criminals can be incarcerated.  Confinement in such a facility continues as long as the individual is under a sentence of confinement and has not been released due to parole or pardon.  An individual is

Hon. Paul G. Gardephe, United States District Judge
June 12, 2023
Page 28

considered confined even though he or she is temporarily or intermittently outside of that facility (e.g., on work release, attending school, or hospitalized).

If Mr. Finkelstein is sentenced to a prison term, he will lose his monthly Social Security benefit payment. This in turn will cause undue hardship to his wife and to his son, who also lives with him. However, if Mr. Finkelstein is sentenced to home detention and probation, he is NOT under the control and jurisdiction of a prison agency, but instead will be under the supervision of a Probation Officer, and thus will still receive his benefits.

While Probation requests incarceration, it nonetheless recognizes the unusual circumstances in this case. As noted on page 27 of the Pre-Sentence Report, the interviewing officer recommends a variance, noting Mr. Finkelstein's lengthy work history, his lack of criminal convictions, and his "familial obligations". What Probation fails to recognize is that those factors, along with his age, and medical issues, make Mr. Finkelstein an appropriate candidate for home detention. Given his caretaker role for his wife, his own surgical needs, his medical issues, including hypertension and diabetes, the most efficient way to ensure both he and his wife receive their necessary medical care is to sentence him to a term of home detention.

Mr. Finkelstein does not deny his criminal conduct; to be fair, the Government should not deny that because of his actions, the overall disabled community was given access to establishments that were otherwise off-limits. This Court should recognize that good result, along with all the mitigating factors here. In light of Mr. Finkelstein's acceptance of responsibility, his lack of criminal history, his need for multiple surgeries and his other medical conditions, along with his familial circumstances, a sentence of probation, with a concurrent term of home detention, will be sufficient, but not greater than necessary, to achieve the ends of justice in this case.

Very truly yours,

David K. Bertan, Esq.

cc:  AUSA Rushmi Bhaskaran (via Email)