

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

July 26, 2023

**BY ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States v. Stuart Finkelstein*, 21 Cr. 217 (PGG)

Dear Judge Gardephe:

  Stuart Finkelstein is scheduled to be sentenced on August 3, 2023. The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's June 12, 2023 sentencing submission, in which he requests a non-incarceratory sentence.

  For six years, Finkelstein embarked on a brazen and relentless campaign to abuse the Americans with Disabilities Act (the "ADA") to obtain cash settlements for himself. In corrupting the ADA and abdicating his professional responsibilities as an officer of the court, he stole identities, forged signatures, and disclosed confidential medical information in pursuit of his monetary goals. His fraud also involved repeated lies—to the courts, to the ADA defense bar, and to the people whose identities he stole. As a result of his fraud, Finkelstein reaped over $600,000 for himself, and caused losses in excess of $1,500,000. Therefore, the Government respectfully submits that a substantial sentence of 48 months' imprisonment would be sufficient, but no greater than necessary, to achieve just punishment for the defendant's crime, to promote respect for the law, and to deter this defendant and others similarly situated from committing similar crimes.

Hon. Paul G. Gardephe
July 26, 2023
Page 2

## I. Relevant Background and Offense Conduct

### A. Finkelstein's Resignation from the New York Bar in 2006

Finkelstein was first admitted to the New York Bar in 1989. (Presentence Report ("PSR"), ¶ 17). In 2006, the Grievance Committee opened an investigation into Finkelstein for attorney misconduct. Finkelstein sought to obstruct that investigation by submitting falsified bank documents. (Ex. B (under seal), at USAO_019408-USAO_019409).[1] Ultimately, Finkelstein resigned from the bar in 2006. (*Id.*). On February 13, 2007, the Supreme Court of the State of New York issued an order (the "Resignation Order") requiring Finkelstein to "desist and refrain from (1) practicing law in any form, either as principal, agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at law." (*Id.*). The Order did not expressly limit its jurisdictional reach to New York. (*Id.*).

Following his resignation from the New York Bar, Finkelstein moved to Florida.

### B. Finkelstein Causes Hundreds of Fraudulent Lawsuits to be Filed in Florida

Just a few years after the Resignation Order was entered, Finkelstein began working on legal matters for an attorney in Florida ("Attorney-1"). (*Id.* ¶ 18). Among other tasks, Finkelstein advised Attorney-1 and his staff on the ADA by identifying public establishments that were potentially not in compliance with the ADA. Once civil defendants were identified, Finkelstein assisted Attorney-1 in drafting, filing, litigating, and settling these matters. While Finkelstein never sought admission to the Florida Bar nor appeared as counsel in any of these ADA matters, he gave his opinions on the ADA and effectively practiced law as a clerk and employee of Attorney-1. Accordingly, Finkelstein's work with Attorney-1 violated the Resignation Order.

---

[1] The Government respectfully requests permission to submit Exhibit B under seal because it contains medical information regarding the defendant's family members.

In 2013, Finkelstein met a wheelchair-bound individual ("Victim-1") at a gas station in Florida. (*Id.* ¶ 19). Finkelstein told Victim-1 that Finkelstein worked for an attorney and asked if Victim-1 would be willing to assist Finkelstein in assessing whether certain public establishments were accessible for wheelchair users. (*Id.*). Finkelstein offered to provide Victim-1 the addresses of certain public establishments, as well as gas money to visit them. (*Id.*). Victim-1 told Finkelstein, in sum and substance, that Victim-1 was glad to help, and gave Finkelstein Victim-1's phone number. (*Id.*). Victim-1, however, did not retain Finkelstein nor anyone else to file lawsuits on Victim-1's behalf. (*Id.*). Moreover, Finkelstein never provided Victim-1 with any addresses to visit. (*Id.*). Victim-1, accordingly, took no action that would provide Victim-1 with standing to sue any place of public accommodation, nor did he retain any attorney to file any such lawsuits.

Without Victim-1's consent, Finkelstein caused to be file 280 ADA lawsuits in Victim-1's name. (Ex. A (under seal),[2] at 1, at 6.[3]). He also assisted in litigating and settling these matters. In so doing, Finkelstein forged Victim-1's signature on countless occasions, including on settlement agreements and on internal records that included the place of public accommodation that Victim-1 purportedly visited.

In August 2015—after hundreds of ADA lawsuits had been fraudulently filed in Victim-1's name—Finkelstein called Victim-1 and asked Victim-1 to sign a document. (PSR ¶ 20). Finkelstein represented that the document was related to a place that Finkelstein wanted Victim-1 to visit that was not ADA-compliant. (*Id.*). On the basis of these representations, Victim-1 signed the document—a signature page, without any further identifying information on the nature of the document. But Finkelstein's representations to Victim-1 were just a ploy. The document was, in fact, a signature page for a settlement agreement for an ADA lawsuit. Victim-1 had no idea what he was signing.

---

[2] Because the exhibited case lists, settlement documents, and bank records often refer to the names of Victim-1 and Victim-2, or include the defendant's PII, the Government respectfully requests permission to file Exhibits A through F under seal.

[3] According to Pacer, there were 295 lawsuits filed in Victim-1's name. In the Government's count of 280 fraudulently-filed Florida lawsuits, it has not included 15 lawsuits that were filed and closed on the same day.

In early 2016, Finkelstein told Victim-1 that news outlets might try to ask Victim-1 some questions and directed Victim-1 not to respond. (*Id.* ¶ 21). Soon thereafter, Victim-1 learned—to his horror and surprise—that Victim-1 was the apparent plaintiff in several ADA lawsuits. (*Id.*). Victim-1, who never authorized anyone to file these lawsuits, demanded that Finkelstein provide any documents that Victim-1 allegedly signed in connection with the Victim-1 lawsuits. Finkelstein never responded to these requests. Instead, he abruptly quit his job with Attorney-1. (*Id.*) Victim-1 filed an attorney misconduct complaint against Attorney-1, who was disbarred as a result. (*Id.* ¶ 23).

Of the approximately 280 lawsuits that were filed on behalf of Victim-1, approximately 190 settled. Based on tax records, Attorney-1 paid Finkelstein, or a company Finkelstein founded (Engineering & Mechanical Services), approximately $319,502.60 between 2013 and 2016 in connection with Finkelstein's ADA work with Attorney-1.[4] The chart below breaks down these payments:

| Year | Stuart Finkelstein | Engineering & Mechanical Services | Total |
|---|---|---|---|
| 2013 | $35,835.20 | | $35,835.20 |
| 2014 | $51,332.40 | $67,715.00 | $119,047.40 |
| 2015 | $41,150.00 | $94,500.00 | $135,650.00 |
| 2016 | $5,750.00 | $23,220.00 | $28,970.00 |
| **Total** | **$134,067.60** | **$185,435.00** | **$319,502.60** |
| Source: Ex. C (under seal) | | | |

### C. Finkelstein Makes Materially False Statements and Omissions to Obtain Readmission the New York State Bar

In September 2014, Finkelstein moved for reinstatement to the New York State Bar. In connection with that motion, Finkelstein stated, falsely, that following his 2007 disbarment, he did not practice law. (*Id.* ¶ 24). Throughout the reinstatement process, Finkelstein concealed his work with Attorney-1. For example, Finkelstein included his 2013 tax returns as an attachment to his application, but these returns fraudulently omitted the income that Attorney-1 paid Finkelstein. (*Id.*). Furthermore, in a September 18, 2015 deposition, Finkelstein repeatedly and deliberately lied to the Character and Fitness Committee (the "Committee") to hide his legal work in Florida. For example, when the Committee first asked how he supported himself financially, Finkelstein stated that he was running a parking business. (Ex. B, USAO_019402). When asked how much money he made in the previous year (2014), Finkelstein stated "Gross was $50,000 – approximately $50,000. That was gross." (Ex. B, USAO_019434). In fact, as

---

[4] In his sentencing submission, the defendant argues that Attorney-1 paid Finkelstein $254,697. This number is wrong for two reasons. *First*, he does not include the income that Attorney-1 paid Finkelstein or his company in 2016 (a total of $28,970). *Second*, the defendant's arithmetic for years 2013, 2014 and 2015 is wrong: the total amount that Attorney-1 paid Finkelstein during these years was $290,532.60.

Hon. Paul G. Gardephe
July 26, 2023
Page 5

shown above, Finkelstein made $119,047 in 2014. When asked why his income had increased from 2013 to 2014, Finkelstein responded "Because I've been concentrating on getting private parties, expanding, yes, brokering, yes." (Ex. B, USAO_019439). And when asked a final time to give the Committee a "brief chronological rundown of what you have done since being disbarred," Finkelstein mentioned many jobs—except his job with Attorney-1:

> When we moved to Florida—before we moved, I had been on the computers and checking out different business websites, what businesses to buy, and one of the things that appealed to me was this valet business because—I said, let me try and have some fun and make money. I had a terrific job when I was a kid working at the car hop at the Concord Hotel. . . . So I formed that company, I started doing a little bit. I also went and got my process server's license from the Broward Sheriff's office and did applications. I was supposed to get eviction work from a big management company, that didn't happen, so I didn't do that at all. I also tried to form a – I did form a corporation, Chatsworth National High School, for inner city kids to get their high school degrees. Advertised like hell by putting it on Miami buses; that didn't work out. Comcast I mentioned to you already. The car wash. I'm trying to remember what else. *That's pretty much it.*

(Ex. C, USAO_019448-49) (emphasis added).

Finkelstein was reinstated to the New York State Bar in March 2016. (PSR ¶ 25).

### D. Finkelstein Files Fraudulent Lawsuits in the Southern and Eastern Districts of New York

Before he was disbarred, Finkelstein represented an individual ("Victim-2") in a personal injury lawsuit. (*Id.* ¶ 27(a)). In 2017, Victim-2's family member ("Family Member-1") was looking for a lawyer to represent Family Member-1 in a personal injury lawsuit. (*Id.* ¶ 27(b)). Victim-2 referred Family Member-1 to Finkelstein. (*Id.*). Until approximately February 2019, Victim-2 spoke to Finkelstein occasionally about the referral, and in one instance, Victim-2 accompanied Family Member-1 to an in-person meeting with Finkelstein in a hotel in Brooklyn. At this meeting, Finkelstein saw that Victim-2 was limping due to a back condition. (*Id.*). Because Victim-2 referred Family Member-1 to Finkelstein, Finkelstein gave Victim-2 a referral fee, paid in three installments between approximately January 2018 to August 2018. (*Id.* ¶ 27(c).[5]).

---

[5] In the PSR, the defendant claims that these payments "were for settled cases." (PSR ¶ 10 n.3.). This is incorrect. As discussed in this submission and in the PSR, Victim-2 was unaware that Finkelstein had filed multiple lawsuits in his name, and furthermore, believed that the payments were related to his referral of his family member to Finkelstein.

Hon. Paul G. Gardephe
July 26, 2023
Page 6

In August 2017, Victim-2 told Finkelstein that Victim-2 had been denied disability benefits. Finkelstein offered to help Victim-2 by referring Victim-2 to a disability benefits attorney. To make the referral, Finkelstein told Victim-2 to provide Finkelstein with Victim-2's medical records. Victim-2 did so in approximately April 2018. (*Id.* ¶ 27(d)).

All while purporting to assist Victim-2 with a disability benefits referral and a separate credit card collection matter, Finkelstein began to file ADA lawsuits, with Victim-2 as the purported plaintiff in the Southern and Eastern Districts of New York. (*Id.* ¶ 26). Victim-1 did not know about Finkelstein's lawsuit spree and never authorized these lawsuits. (*Id.* ¶ 27). Nor did Victim-2 take any action that would give Victim-2 standing to sue under the ADA. In the course of this scheme, Finkelstein revealed confidential medical information about Victim-2 in the ADA litigation, which Finkelstein received from Victim-2 on the pretense that the information was needed to help Victim-2 find a disabilities benefits lawyer. In addition, Finkelstein forged Victim-2's signatures on settlement agreements and HIPAA releases. In total, Finkelstein filed approximately 28 lawsuits purportedly in Victim-2's name. (Ex. D (under seal)).[6]

In January 2018, Finkelstein fraudulently filed a lawsuit ("Lawsuit-1") against a restaurant ("Restaurant-1") with Victim-2 as the named plaintiff. (PSR ¶ 30). In connection with this lawsuit, Finkelstein forged Victim-2's signature on a medical power of attorney forms. (*Id.* ¶ 30(b)). After Restaurant-1's lawyers raised concerns about the authenticity of the power of attorney form, particularly in light of Victim-2's seeming unavailability to appear for a deposition, the federal judge presiding over the case ("Judge-1") ordered Finkelstein and Victim-2 to appear for an in-person conference on July 13, 2018. (*Id.* ¶ 30(c), 30(d)).

Finkelstein needed to find a way for Victim-2 to appear for the conference. Without telling Victim-2 that Finkelstein had filed dozens of lawsuits in Victim-2's name, Finkelstein simply asked Victim-2 to attend a conference in exchange for cash. He also told Victim-2 to show up in a wheelchair. (*Id.* ¶ 30(e)). Victim-2 did not have a wheelchair, so Finkelstein gave him money to buy one. Victim-2 did as Finkelstein instructed.

Once at the conference, Finkelstein instructed Victim-2 on how to answer Judge-1's questions. When Judge-1 asked Victim-2 if he had in fact signed the power of attorney form, Victim-2 said, falsely, that he had. (*Id.* ¶ 30(f)). After the conference, Victim-2 posed for a photograph with Finkelstein in front of the conference, and Finkelstein gave Victim-2 cash. (*Id.* ¶ 30(g)). It was only during the course of this conference that Victim-2 realized that Finkelstein had filed Lawsuit-1 on his behalf—which Victim-1 never authorized, and for which he had no standing to sue. After reflecting on Finkelstein's actions, Victim-2 became very upset, decided to cease communicating with Finkelstein, and blocked Finkelstein from calling or emailing him.

---

[6] The Government removed duplicate lawsuits from its count of the total number of lawsuits filed in Victim-2's name.

Victim-2 did not learn the full extent of Finkelstein's deception until January 2019, when a reporter from the New York Post came to Victim-2's home and asked Victim-2 about the dozens of lawsuits that Finkelstein had filed in Victim-2's name.

In February 2019, the New York Post published an article detailing the fraud surrounding the Victim-1 and Victim-2 lawsuits. As a result of that reporting, several of the defendants in Finkelstein's ADA lawsuits wrote to the courts, asking for intervention. For example, in a case that had been assigned to another federal district court judge ("Judge-2") that had settled and closed, the civil defendant in that case asked Judge-2 to reopen the lawsuit to determine whether the lawsuit was filed fraudulently. In response to that request, Judge-2 schedule a court conference for May 1, 2019, ordering Finkelstein and Victim-2 to appear. (*Id.* ¶ 32). Rather than appear for that conference by himself—which would have exposed Finkelstein's fraud—Finkelstein obstructed Judge-2's inquiry by offering to return a portion of the settlement proceeds if the attorney dropped his request for a hearing. The attorney agreed to do so. As a result, the hearing was never held.

Similarly, in response to allegations of fraud in other Victim-2 lawsuits, Finkelstein filed false declarations, made under penalty of perjury, in cases pending before two other Southern District Judges. In these declarations, Finkelstein stated, falsely, that Victim-2 lawsuits were authorized, when in fact they were not. (*Id.* ¶ 28). In support of these false declarations, Finkelstein included the photograph that he took with Victim-2 following the July 2018 conference

Approximately 21 of the lawsuits that Finkelstein filed with Victim-2 as the purported plaintiff settled. In total, Finkelstein collected approximately $323,600 in attorney's fees from the Victim-2 lawsuits. *See* Appendix A, Fig 3.

## II. The Defendant's Plea and Applicable Guidelines Range

### A. Applicable Law

On July 12, 2022, Finkelstein pleaded guilty to Count One of the Indictment, which charged him with mail fraud. In the plea agreement, the Government took the position that the loss exceeded $1,500,000 but was less than $3,500,000. The defendant reserved the right to argue at sentencing that the loss amount exceeded $550,000 but was less than $1,500,000. The parties further stipulated to enhancements for multiple victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), and use of a special skill to facilitate the crime, pursuant to U.S.S.G. § 3B1.3. Accordingly, the Government calculated the defendant's Guideline Range to be 51 to 63 months' imprisonment, and the defendant calculated his Guidelines Range to be 41 to 51 months' imprisonment. The parties accordingly stipulated to a Guidelines Range (the "Stipulated Guidelines Range") of 41 to 63 months imprisonment.

Hon. Paul G. Gardephe
July 26, 2023
Page 8

The Probation Department adopted the Government's calculation of the Guidelines and recommends a sentence of 36 months' imprisonment.

### B. The Loss Amount Is Between $1,500,000 But Less Than $3,500,000

Once a defendant's relevant conduct is determined, the sentencing court must then make a "reasonable estimate" of the loss amount for the defendant's offense. *See* U.S.S.G. § 2B1.1, Application Note 3(C). "[L]oss is the greater of actual loss or intended loss." *See* U.S.S.G. § 2B1.1, Application Note 3(C). A "district court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir. 2000); *see also United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997) (the "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision. . . . [I]t is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown."). Some factors that a sentencing court may consider to determine loss include "[t]he approximate number of victims multiplied by the average loss to each victim" as well as "[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations." U.S.S.G. § 2B1.1, Application Note 3(C)(iv), (vi).

For the reasons set forth below, the Government submits that the loss amount, either using a conservative estimate of actual loss, or a conservative estimate of intended loss, yields a loss amount between $1,500,000 but less than $3,500,000. In urging the Court to adopt a lower loss amount, the defendant principally argues that the Court should not include the cost that victims paid in litigating the defendant's fraudulent lawsuits because such expenses are too speculative. The defendant's arguments lack merit because the Government estimation of litigation expenses are based on actual data.

### i. A Conservative Estimate of the Actual Loss Is Between $1,500,000 and $3,500,000

The Government's estimate of actual losses from the Victim-1 and Victim-2 lawsuits is **$2,281,483.58**. *See* Appendix A, Fig. 1.

Each fraudulent lawsuit has two components of loss: the attorney's fees paid to settle the matter, and the litigation expenses that were incurred in defending the fraudulent lawsuit (together, the "Lawsuit Loss Amount"). The Government has data on the attorney's fees or litigation expenses for 15 of the 280 Florida lawsuits and 21 of the New York lawsuits. This data comes from settlement agreements, information from victims, and bank records. Given the number of lawsuits, it would not be practicable to obtain this information for the remaining lawsuits. Instead, the Government has estimated the total loss by (*i*) using the data it has to arrive at an average Lawsuit Loss Amount, then (*ii*) multiplying the average Lawsuit Loss

Hon. Paul G. Gardephe
July 26, 2023
Page 9

Amount by the total number of lawsuits, to (*iii*) arrive at a reasonable estimate of the total loss amount. *See Bryant*, 128 F.3d at 75-76 (approving the use of the average amount of loss per transaction to calculate total loss).

Using this method, the settled Florida lawsuits generated an average attorney's fee settlement payment of $5,013.27 and litigation expenses of $3,039.63, for a total average Lawsuit Loss amount of $8,052.90. Multiplying that average Lawsuit Loss Amount by the 190 settled Florida lawsuits, the estimated loss amount for the Florida lawsuits is approximately **$1,530,050.58**. *See* Appendix A, Fig. 2.[7]

Likewise, with respect to the Victim-2 lawsuits in New York, the average attorney's fee was $16,180 and the average litigation expenses were $20,373.00, for a total average Lawsuit Loss Amount of $36,020.62. Extrapolating this figure across the approximately 21 lawsuits that settled, the actual estimated loss amount for the New York lawsuits is **$751,433**. *See* Appendix A, Fig. 3. Adding the Florida and New York numbers together results in an estimated actual loss amount of **$2,281,483.58**. *See* Appendix A, Fig. 1.

### ii. A Conservative Estimate of the Intended Loss Amount Is Between $1,500,000 and $3,500,000

An alternative way to calculate the loss amount is to use the intended loss amount. Under this approach, the loss amount still falls within $1,500,000 and $3,500,000, whether or not litigation expenses are included.

Here, every lawsuit filed in Victim-1 and Victim-2's name was fraudulent. Accordingly, each time the defendant filed or help file any such lawsuit, he intended to cause a loss of the attorney's fees he expected to earn—at minimum. In Florida, the average attorney fee, as discussed above, was $5,013.27, and there were 280 lawsuits filed. Accordingly, the intended loss (based on attorney fee awards alone) across 280 cases that were filed in Victim-1's name generates an intended loss amount of $1,403,714.67. In New York, the average attorney fee payment was $16,180, and there were approximately 28 lawsuits filed. Accordingly, the intended loss amount (based on attorney fee awards alone) across these 28 lawsuits is $453,040. Based on these calculations, the intended loss amount for all lawsuits, not including litigation expenses, is **$1,856,754.67.**

If the Court were to calculate intended loss using both attorney's fees *and* litigation expenses, the total estimated intended loss amount would be **$3,278,295.38**. *See* Appendix A, Fig. 1. For the Victim-1 lawsuits, the average litigation expense for each lawsuit is

---

[7] This loss estimate is conservative in important ways. First, the Lawsuit Loss Amount is conservative because it does not include ADA expert fees or remediation fees in its calculation of the Lawsuit Loss Amount. Second, the number of lawsuits is conservative because it does not include the cases that did not settle, which would have incurred some litigation expenses.

Hon. Paul G. Gardephe
July 26, 2023
Page 10

approximately $3,039. Multiplied by the 280 lawsuits filed in Florida, this amounts to $851,096.71. In New York, the average litigation expenses for each lawsuit are approximately $20,373. Multiplied by the 28 New York lawsuits, this amounts to $570,444. Adding these numbers to the attorney's fees, set forth above, the total intended loss amount would be **$3,278,295.38.**

Accordingly, using either calculation method, the loss amount falls between $1,500,000 and $3,500,000.[8]

## III. Discussion

### A. Applicable Law

Although the Guidelines are no longer mandatory, they provide strong and relevant guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a), including, among others, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and

---

[8]   Because the loss can be reasonably estimated, the court should not employ a gain analysis. *See* U.S.S.G. § 2B1.1, Application Note 3(B). However, if the Court were to use a gain analysis, the Government submits that the defendant's gains from the fraud would be $643,102.60.

ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (quoting *Gall*, 552 U.S. at 50).

### B. A Sentence of 48 Months' Imprisonment Would Be Sufficient, But Not Greater Than Necessary, to Achieve the Goals of Sentencing

In this case, the Government believes that a sentence of 48 months' imprisonment would achieve the goals of sentencing and appropriately balance the factors considered pursuant to Section 3553(a).

*First*, the nature and seriousness of the offense and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). A lawyer is an "officer of the legal system with special responsibilities for the quality of justice." N.Y. Rules of Prof'l Conduct, Preamble: A Lawyer's Responsibilities. "[E]ach lawyer has a duty to uphold the legal process; to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice." *Id*. The functioning of our legal system depends on counsel operating in good faith, making truthful representations, and safeguarding the trust of their clients. The defendant—an officer of the court—abandoned these principles again and again with his years-long scheme of filing lawsuits that were never authorized and for which there was no standing. These actions tarnished respect for the ADA and wasted the resources of the ADA defense bar and the courts. The defendant also abused the trust of his former client, Victim-2, by telling Victim-2 he was helping him with a different litigation matter as a ruse to get Victim-2's medical records. This egregious conduct warrants a significant incarceratory sentence.

The Government does not dispute that, as a result of the defendant's lawsuits, several sued establishments made remediations under the ADA. But the defendant did not commit this fraud because he wanted to help the disabled. If the defendant was the crusader of the disabled that he purports to be, then he has no excuse for failing to find a plaintiff who had actual standing to sue. Indeed, real plaintiffs—with actual standing—would be in the best position to advise on areas of potential ADA noncompliance that were interfering with their ability to enjoy a public premise. Real plaintiffs would have also contributed to settlement discussions and could have received damages for state law-based claims. If the defendant was truly committed to championing their rights, then it makes little sense that he would divulge confidential medical information in court filings that were not necessary to his claims or forge signatures of his purported clients. The defendant's conduct strongly suggests that his primary motivation was, accordingly, greed.

*Second*, the need for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a substantial sentence. See 18 U.S.C. § 3553(a)(2)(A), (2)(B). Finkelstein's fraudulent lawsuit spree undermines the ADA. It promotes cynicism about ADA plaintiffs and lawsuits, which detracts from the fundamental goal of achieving ADA compliance. Litigants waste time wondering whether a plaintiff's grievances are

legitimate, instead of focusing on remediation. Congress never intended the ADA to be abused in this manner, and the Court's sentence should send a strong message that fraudulent use of landmark legislation will be met with a significant sentence.

*Third*, a sentence of 48 months' imprisonment in necessary to protect the public from the defendant's crimes. In the last 15 years, the defendant has repeatedly shown his utter disrespect for our system of justice and his total disregard for the truth. When he was first under investigation for attorney misconduct, he submitted falsified bank documents to the Grievance Committee. After he was disbarred, he violated the Resignation Order by working with Attorney-1 and committed the instant fraud in Florida. Then, when he sought readmission in New York, he repeatedly lied to the Character and Fitness Committee and was ultimately readmitted to the bar. And even when the fraud was discovered and Attorney-1 was disbarred, the defendant was undeterred from continuing his fraud in New York. There is no meaningful indication that the defendant has moved past his decade of lies and deceit. Accordingly, even though the defendant does not have any criminal history points, a substantial sentence is necessary to specifically deter this defendant and protect the public from his crimes.

*Fourth*, none of the defendant's remaining arguments for a non-incarceratory sentence have any merit. The defendant argues, based on *United States v. Avenatti*, 19 Cr. 373 (PGG), Dkt. 341, that he is entitled to a variance because a supposed co-conspirator, Attorney-1, was not charged and suffered no consequences. To be sure, Attorney-1 failed to supervise Finkelstein, violated his professional obligations, and suffered significant consequences because he was disbarred. However, unlike in *Avenatti*, the Government has never in this case referenced Attorney-1 as a co-conspirator. (*Id.* at 43). Indeed, unlike Geragos, who sat through meetings with Nike where Avenatti made his extortionate threats, the Government does not have evidence that Finkelstein ever informed Attorney-1 that Victim-1 had not authorized the lawsuits or had any standing to sue. Accordingly, Attorney-1 was not a "central figure in the criminal conduct." (*Id.* at 43).

Last, the defendant's familial obligations do not warrant a variance. It is a sad truth that defendants' families bear some of the emotional and financial consequences of their loved ones' incarceration. That is as true of Finkelstein's family as it is of the families of many other defendants that appear before the Court for sentencing, whether drug dealers, gang members, or fraudsters. Finkelstein made a choice to engage in fraud—including at a time when his family members were suffering from health issues. When he committed this crime, he did so knowing the potential cost to his family. He must now face the consequences of that choice. In addition, Finkelstein's medical conditions do not warrant a variance. The BOP has the capacity to care for inmates with a range of medical issues, including by designating them in one of BOP's Federal Medical Centers.

### IV. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of 48 months' imprisonment would be sufficient, but no greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Rushmi Bhaskaran
Assistant United States Attorney
(212) 637-2439

cc: David Bertan, Esq. (by ECF)

## Appendix A

**Figure 1: Total Loss Calculations for Florida (Victim-1) and New York (Victim-2) Lawsuits**

| Loss Category | Amount |
|---|---|
| Estimate of Actual Loss for Florida and New York Law Suits | $2,281,483.58 |
| Estimate of Intended Loss for Florida and New York Lawsuits (Attorneys Fees and Litigation Expenses) | $3,278,295.38 |
| Estimate of Intended Loss for Florida and New York Lawsuits (Attorneys Fees Only) | $1,856,754.67 |

Hon. Paul G. Gardephe
July 26, 2023
Page 15

**Figure 2: Loss Calculations for Florida (Victim-1) Lawsuits**

| # | Sued Parties | Attorney's Fees Awarded | Litigation Expenses | Source |
|---|---|---|---|---|
| 1 | Bae Davie Properties, LLC (15-cv-80596-WPD) | $7,500.00 | $3,905.00 | Ex. E, at 7, 13[9] (settlement agreement and billing summary) |
| 2 | 600 Hallandale, LLC (14-cv-61943-MGC) | $4,500.00 | $2,500.00 | Ex. E, at 17 (attorney information) |
| 3 | Sally and Thomas Cronan (14-cv-61944-UU) | $4,500.00 | Not charged | Ex. E, at 17 (attorney information) |
| 4 | A Plus Urgent Care of Hollywood, LLC (14-cv-60510-CMA) | $6,000.00 | $3,500.00 | Ex. E, at 20 (attorney information) |
| 5 | Il Torre Pizza Mia Corp. (14-cv-24263-PCH) | $5,000.00 | $4,000.00 | Ex. E, at 20 (attorney information) |
| 6 | Infocom LLC (14-cv-23777-FAM) | $5,000.00 | $3,250.00 | Ex. E, at 20 (attorney information) |
| 7 | J&S Auto Leasing (14-cv-22987-KMM) | $6,999.00 | $3,250.00 | Ex. E, at 20 (attorney information) |
| 8 | Los Perros Sunny Isles, LLC (14-cv-23953-RNS) | $6,000.00 | $3,250.00 | Ex. E, at 20 (attorney information) |
| 9 | Florida Level and Transit Co (15-cv-60712-UU) | $4,500.00 | $3,701.68 | Ex. E, at 22, 23, 42-48 (restitution request) |

---

[9] For Exhibits E and F, the referenced page numbers are in the lower left corner of each page of the exhibit.

Hon. Paul G. Gardephe
July 26, 2023
Page 16

| # | Sued Parties | Attorney's Fees Awarded | Litigation Expenses | Source |
|---|---|---|---|---|
| 10 | Hassan Cousins (15-cv-61105) | $4,000.00 | | Ex. E, at 49 (settlement agreement) |
| 11 | Mohammad Eftekhari and Firouzeh Eftekahri (15-cv-61921-WPD) | $3,900.00 | | Ex. E, at 50 (settlement agreement) |
| 12 | 1230 S Andrews Ave (15-cv-61379-DMM) | $2,000.00 | | Ex. E, at 57 (settlement agreement) |
| 13 | Faber/Kurtz Properties I, Inc. (15-cv-62319-BB) | $2,500.00 | | Ex. E, at 66 (settlement agreement) |
| 14 | 2716 & 2724 North Dixie (14-cv-80505-AOV) | $7,800.00 | | Ex. E, at 73 (settlement agreement) |
| 15 | Holy Cross Hospital (15-cv-61203) | $5,000.00 | | Ex. E, at 83 (settlement agreement) |
| | TOTAL | $75,199.00 | $27,356.68 | |
| | **AVERAGE** | **$5,013.27** | **$3,039.63** | **$8,052.90** |
| | **ACTUAL LOSS ESTIMATION FOR 190 SETTLED CASES (AVERAGE x 190):** | $952,520.67 | $577,529.91 | $1,530,050.58 |
| | **INTENDED LOSS FOR 280 CASES (AVERAGE x 280)** | $1,403,714.67 | $851,096.71 | $2,254,811.38 |

Hon. Paul G. Gardephe
July 26, 2023
Page 17

### Figure 3: Loss Calculations for New York (Victim-2) Lawsuits

| # | Sued Parties | Attorney's Fees Awarded | Litigation Expenses | Source |
|---|---|---|---|---|
| 1 | Hasaki Restaurant (17-cv-06521) | $3,600.00 | | Ex. F, at 2 (bank records) |
| 2 | Croman, 232 W 14 Restaurant Group (18-cv-2077) | $18,000.00 | $3,500.00 | Ex. F, at 25 (bank records), at 102 (restitution request) |
| 3 | P.E.C. Group and Patrizio Siddu (17-cv-09061) | $18,000.00 | $21,391.00 | Ex. F, at 22 (bank records), 138 (restitution request) |
| 4 | 305-7 East 84th Street Associates (17-cv-09239) | $5,000.00 | $36,690.00 | Ex. F, at 29 (bank records), 36 (restitution request) |
| 5 | Verns Restaurant Group (17-cv-9577) | | $19,911.00 | Ex. F, at 65 (restitution request) |
| 6 | 25 West 13th Corp. (17-cv-07256) | $36,000.00 | | Ex. F, at 16 (bank records) |
| 7 | 148 Hoyt Street LLC dba The Brooklyn Inn (17-cv-05722) | $17,000.00 | | Ex. F, at 15 (bank records) |
| 8 | GAT 35 Corp. / New School (17-cv-08630) | $18,000.00 | | Ex. F, at 16, 18 (bank records) |
| 9 | Whitman's Restaurant Group LLC (17-cv-6658) | $10,000.00 | | Ex. F, at 17 (bank records), 145 (settlement agreement) |
| 10 | Rivka, Inc. dba Café Mogador (17-cv-07697) | $18,000.00 | | Ex. F, at 18 (bank records) |
| 11 | Just an Oven Corp. (17-cv-07064) | $18,000.00 | | Ex. F, at 19 (bank records) |
| 12 | Zimmerman, Schmul, Man 441 | $18,000.00 | | Ex. F, at 19 (bank records) |

Hon. Paul G. Gardephe
July 26, 2023
Page 18

| # | Sued Parties | Attorney's Fees Awarded | Litigation Expenses | Source |
|---|---|---|---|---|
| | LLC (17-cv-07697) | | | |
| 13 | Standell Realty Company, LLC (17-cv-6112) | $16,000.00 | | Ex. F, at 22 (bank records) |
| 14 | 189 Hester St. LLC, Original Puglia (18-cv-111) | $20,000.00 | | Ex. F, at 24 (bank records) |
| 15 | Newstead Restaurant LLC dba Left Bank (18-cv-1789) | $18,000.00 | | Ex. F, at 24 (bank records) |
| 16 | Phillip Russo, Frank Russo (17-cv-05722 (EDNY)) | $15,000.00 | | Ex. F, at 25 (bank records) |
| 17 | EAE Corp. dba Sidewalk Bar & Restaurant 17-cv-05722 (EDNY) (18-cv-871) | $5,000.00 | | Ex. F, at 26 (bank records) |
| 18 | 124 Macdougal (18-cv-1152) | $15,000.00 | | Ex. F, at 29 (bank records) |
| 19 | 116 E. 31st Street Realty Associates LLC (18-cv-588) | $25,000.00 | | Ex. F, at 31 (bank records) |
| 20 | Zenon Chernyk (18-cv-347) | $15,000.00 | | Ex. F, at 34-35 (bank records) |
| 21 | Adair Lincoln (18-cv-01789) | $15,000.00 | | Ex. F, at 34 (bank records) |
| | **TOTAL** | $323,600.00 | $81,492.00 | |
| | **AVERAGE** | **$16,180.00** | **$20,373.00** | **$36,553.00** |
| | **ACTUAL LOSS ESTIMATION FOR 21 SETTLED CASES:** | **$323,600.00** | **$427,833.00** | **$751,433.00** |